# In the United States Court of Federal Claims

No. 09-160L
(Filed October 8, 2009)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * | * | Contracts; breach of trust; RCFC |
| | * | 12(b)(1); motion to dismiss for |
| **CONFEDERATED TRIBES AND** | * | lack of ripeness; jurisdiction |
| **BANDS OF THE YAKAMA NATION,** | * | under 28 U.S.C. § 1491(a)(1) |
| ***et al.,*** | * | (2006), 28 U.S.C. § 1505 (2006); |
| | * | statute of limitations for |
| Plaintiffs, | * | collection action, 28 U.S.C. |
| | * | § 2415 (2006); Indian Long- |
| v. | * | Term Leasing Act, 25 U.S.C. |
| | * | § 380 (2006), 25 C.F.R. pt. 162 |
| **THE UNITED STATES,** | * | (2009); Debt Collection |
| | * | Improvement Act, 31 U.S.C. |
| Defendant. | * | §§ 3701-3720E (2006); statute |
| | * | of limitations for Court of |
| * * * * * * * * * * * * * * * * * * * * * | * | Federal Claims, 28 U.S.C. |
| | | § 2501 (2006). |

Thomas Zeilman, Yakima, WA, for plaintiffs.

Maureen E. Rudolph, Washington, DC, with whom was Acting Assistant Attorney General John Cruden, for defendant. Marlene Zichlinsky, U.S. Department of the Interior, of counsel.

## MEMORANDUM OPINION AND ORDER

**MILLER**, Judge.

Before this court after argument is defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1). Defendant contends that the claim of an American Indian tribe and Indian allotment owners for breach of trust and fiduciary duties is not ripe because it is premised on contingent future events—namely, debt collection and enforcement actions under the aegis of the Secretary of the United States Department of the Interior—that may not occur as anticipated, if at all. Plaintiffs maintain that the statute of limitations applicable to the Secretary's actions has expired, so that their claim has accrued.

**FACTS**

The facts are drawn from the complaint, as supplemented by documents reflecting the operative contract history, as well as records of decisions by the cognizant government officials, the Bureau of Indian Affairs (the "BIA"), and an appellate review board.  Mindful that plaintiffs must establish subject matter jurisdiction on disputed evidence, see Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988); see also N. Hartland, L.L.C. v. United States, No. 2008-5008, 2009 WL 223867, at *3 (Fed. Cir. Feb. 2, 2009) ("'All other facts underlying the controverted jurisdictional allegations are in dispute and are subject to fact-finding by the district court.'" (quoting Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1584 (Fed. Cir. 1993))); Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999) ("Fact-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged."), the court makes findings based on the materials submitted with the parties' briefs on defendant's motion, see Rocovich v. United States, 933 F.2d 991, 994 (Fed. Cir. 1991) (allowing and considering submissions of relevant evidence to resolve factual dispute regarding subject matter jurisdiction).

The following facts are established, for the purpose of ruling on defendant's motion, by the record submitted to date.  The claim over which the United States Court of Federal Claims' subject matter jurisdiction is contested alleges the Government's breach of trust and fiduciary duties in collecting rent owed by a lessee to plaintiff lessors, the Confederated Tribes and Bands of the Yakama Nation (the "Yakama Nation") and eighteen individual landowners (together with the Yakama Nation "plaintiffs").  The lessee's debt of unpaid principal arose from 1996 until 2000, during the second quarter of a twenty-year lease approved and administered by the United States Department of the Interior on plaintiffs' behalf.  Implicated by plaintiffs' complaint are the activities of three entities within the Department of the Interior: the Superintendent of the Yakama Agency (the "Superintendent") of the BIA; the Northwest Regional Director of the BIA (the "Regional Director"), who oversaw the Superintendent's activities and received appeals of decisions by the BIA; and the Interior Board of Indian Appeals (the "IBIA"), which reviewed appeals of decisions of the Regional Director.

A treaty concluded on June 9, 1855, between the Government and the Yakama Nation reserved, for the use of and occupation by the Yakama Nation, a tract of land on the banks of the Yakama and Attah-num Rivers (the latter now the Ahtanum Creek) in what is now the State of Washington (the "Yakama Reservation").  Treaty Between the United States and the Yakama Nation of Indians, U.S.-Yakama Nation, art. II, June 9, 1855, 12 Stat. 951. Currently, the Yakama Nation possesses a fractional ownership interest in adjoining parcels of land within the Yakama Reservation, Yakama Allotments Nos. 955 and 956 (the "Allotments"), obtained through a purchase made pursuant to 25 U.S.C. § 607 (2006).  The

other named plaintiffs—the eighteen individual landowners, of whom seventeen are enrolled members of the Yakama Nation and one is an enrolled member of the Colville Confederated Tribes of American Indians—possess fractional ownership interests in the Allotments as heirs of the original allottees. The Secretary of the Interior holds the Allotments in a trust status for the benefit of plaintiffs. Compl. filed Mar. 11, 2009, ¶ 1; <u>see also</u> 25 C.F.R. pt. 162 (2009).

The Indian Long-Term Leasing Act and the regulations promulgated under 25 U.S.C. §§ 380, 415(a) (2006), provide that the owners of interests in restricted Indian lands which are held in trust may lease these lands with the approval of the Secretary of the Interior. <u>See</u> 25 C.F.R. pt. 162. On September 2, 1992, the Superintendent, according to authority delegated by the Secretary of the Interior, approved Recreational Lease No. 5-1-7865-9110 (the "Lease") between plaintiffs and Yakima Ridgerunners, Inc., a Washington non-profit corporation ("Ridgerunners"). <u>1/</u> <u>See generally</u> Def.'s Br. filed June 11, 2009, Ex. A at 1; Compl. ¶ 5. For a period of what was expected to be twenty years, from January 1, 1991, until December 31, 2010, plaintiffs leased 15.17 acres of the Allotments to Ridgerunners for Ridgerunners' use as a park for camping and recreational vehicles. Plaintiffs and Ridgerunners agreed to an initial annual rent of $1,200.00, due in advance to the Superintendent on December 1 of each year, which then would be subject to review and adjustment by the Superintendent at not less than five-year intervals. <u>2/</u> Additionally, an

――――――――――――――――――

        <u>1/</u> During argument defendant cited 25 C.F.R. § 162.14 (1999), of the pre-2001 Indian Long-Term Leasing Act regulations as the express delegation of authority from the Secretary of the Interior to the BIA. Transcript of Proceedings, <u>Confederated Tribes & Bands of the Yakama Nation v. United States</u>, No. 09-160L, at 21 (Fed. Cl. Sept. 14, 2009) ("Tr."). To ensure clarity in citing to the amended and current regulations, citations to the pre-2001 enactment of 25 C.F.R. pt. 162 (1999), will include the parenthetical "(1999)".

        Section 162.14 describes the Secretary of the Interior's available remedial options when responding to violations of leases of Indian lands. <u>See</u> 25 C.F.R. § 162.14 (1999). Elsewhere in the pre-2001 regulations, the Secretary of the Interior is authorized to grant leases of Indian lands that are held in trust by the United States. 25 C.F.R. §§ 162.1(b), 162.2 (1999). As used in these regulations, "Secretary" encompasses "the Secretary of the Interior or his authorized representative acting under delegated authority." 25 C.F.R. § 162.1(a) (1999). The parties have not supplied the express delegation of authority from the Secretary of the Interior to the BIA specific to the approval and administration of the Lease.

        <u>2/</u> The Lease states: "Such review shall give consideration to the economic conditions at the time, exclusive of improvement or development required by this contract or the contribution value of such improvements." Def.'s Br. filed June 11, 2009, Ex. A at 2.

agreed-upon rider attached to the Lease provided that rent payments remaining delinquent for more than thirty days would be penalized at an annual rate of 18%, to be applied from the payment due-date until the date of actual payment. Ridgerunners paid the $1,200.00 annual rent due for the first quarter of the Lease (spanning the calendar years and rental periods of 1991 through 1995), notwithstanding an incidental carry-over balance of $135.52 for late-payment penalties.

In 1995, pursuant to the Lease's rental adjustment provisions, the Superintendent reappraised Ridgerunners' annual rent from $1,200.00 to $3,230.00 for the Lease's second quarter (1996 through 2000). See Yakima Ridgerunners, Inc., 44 I.B.I.A. 72, 73-74 (2007). Nevertheless, the BIA failed to notify Ridgerunners of this reappraisal until November 26, 1996, on which date Ridgerunners was advised by certified letter that its rent had increased to $3,230.00, retroactive for the full 1996 calendar year. At that time Ridgerunners had thirty days within which to appeal the Superintendent's decision. See 25 C.F.R. § 2.9(a). Ridgerunners failed to appeal the reappraisal decision within thirty days; therefore, the reappraisal became final on or about December 27, 1996. 3/ Yakima Ridgerunners, 44 I.B.I.A. at 73-74; see also 25 C.F.R. § 2.6(b).

A dispute between Ridgerunners and the BIA soon arose. Inexplicably, despite the reappraisal's finality, the BIA continued to invoice Ridgerunners for $1,200.00 annually, not $3,230.00. See Yakima Ridgerunners, 44 I.B.I.A. at 74; see also Def.'s Br. filed July 27, 2009, Ex. J at 10-13. In turn, Ridgerunners continued to pay the invoiced amount of $1,200.00, not the reappraised $3,230.00 amount. See Yakima Ridgerunners, 44 I.B.I.A. at 74. On October 10, 1997, Ridgerunners received a certified letter from the BIA with the

---

3/ In its January 11, 2007 decision, the IBIA stated that "[i]t is undisputed that [Ridgerunners] did not timely appeal [the Lease's second-quarter rent reappraisal]." Yakima Ridgerunners, 44 I.B.I.A. at 74. In correspondence to the Superintendent dated December 9, 2000, Ridgerunners asserted that, upon learning of the Lease's second-quarter rent reappraisal via the November 26, 1996 notice, it had "precisely followed the appeal procedure, with the exception of the new address of the Area Director . . . . [and] [d]ue to the wrong address on the appeal, it was returned . . . after the 30 day time window for appeal." Def.'s Br. filed July 27, 2009, Ex. J at 19. Ridgerunners then called the Superintendent "to see what action could be taken, [but] was informed that the Yakima [sic] Agency had not received the appeal." Id. Had the BIA received the appeal, it likely would have been determined to be timely. See 25 C.F.R. § 2.9(a) (allowing that "[a] notice of appeal that is filed by mail is considered filed on the date that it is postmarked"). The record suggests that Ridgerunners made no subsequent effort to re-file the appeal.

following message: Ridgerunners' rent principal was $4,030.00 4/ in arrears for the calendar years 1996 and 1997, plus 18% interest. See id. The BIA provided Ridgerunners with ten days within which to show cause as to why the Lease should not be cancelled.

While it appears that Ridgerunners never provided the BIA with a written response to the show-cause letter, Ridgerunners has maintained, as evidenced by its letter of April 19, 2004, that it "ask[ed] for negotiation on lease increases, retroactive billing, and interest accruing on debt not owed since 1997 . . . ." Def.'s Br. filed July 27, 2009, Ex. J at 2. Further, Ridgerunners argued to the IBIA in a January 19, 2005 letter that, in response to Ridgerunners' protests, BIA employees instructed Ridgerunners to continue paying $1,200.00 until the dispute was resolved. Although the record is not clear regarding when or with whom these conversations may have occurred, 5/ see Yakima Ridgerunners, 44 I.B.I.A. at 74, it is undisputed that the BIA did not cancel the Lease at that time and that Ridgerunners continued to pay the $1,200.00 invoiced annually by the BIA. 6/

_____

4/ As previously found by the IBIA, "[t]he amount in arrears appears to have been miscalculated and should have been $4,060 as [Ridgerunners] continued to pay the original annual rent amount of $1,200, but paid nothing towards the increased rent amount of $2,030." Yakima Ridgerunners, 44 I.B.I.A. at 74 n.6.

5/ Ridgerunners contended before the IBIA that between 1996 and 1999 Ridgerunners frequently expressed its concerns with a BIA Realty Office employee, Ruben Bending, and that Ridgerunners was told to continue paying $1,200.00. Def.'s Br. filed July 27, 2009, Ex. H at 3. Whether Ridgerunners did speak with Mr. Bending or any other BIA employee during this time period is unclear. On one hand, the IBIA found that these conversations with Mr. Bending apparently took place after 2001. See Yakima Ridgerunners, 44 I.B.I.A. at 74 n.7. Similarly, in an appeal to the Regional Director dated April 19, 2004, Ridgerunners referred to six conversations with "Rubin [sic] Bending" that seem to have occurred no earlier than November 2002. Def.'s Br. filed July 27, 2009, Ex. J at 2. On the other hand, in an appeal to the IBIA dated January 19, 2005, Ridgerunners claimed that it contacted Mr. Bending "on many occasions" before 1999. Id., Ex. H at 3.

6/ It is unclear whether the BIA invoiced Ridgerunners for $1,200.00 (improperly) or $3,230.00 (properly) for the calendar year 2000. Ridgerunners previously has maintained that an invoice for calendar year 2000 provided by the BIA to the IBIA, dated on or about November 1999 and showing an amount due from Ridgerunners of $3,230.00, was a "fabrication." Yakima Ridgerunners, 44 I.B.I.A. at 74 n.4. Yet, in its April 2004 appeal to the Regional Director, Ridgerunners admitted that "[i]n November 1999, the billing was in the amount of $3230 [sic]." Def.'s Br. filed July 27, 2009, Ex. J at 2; see also Yakima Ridgerunners, 44 I.B.I.A. at 74 n.4. Moreover, although Ridgerunners in its April 2004

During late 2000, at about the same time that the BIA conducted and notified Ridgerunners of the results of a new five-year rent appraisal, the BIA again advised Ridgerunners of its outstanding rent balance from the Lease's second quarter. On November 30, 2000, a certified letter from the BIA provided Ridgerunners with another ten-day window within which to show cause as to why the Lease should not be cancelled on account of Ridgerunners' outstanding balance of cumulative principal and interest: $10,150.00. One day later, the BIA informed Ridgerunners that its annual rent again had been reappraised and would increase from $3,230.00 to $3,320.00 for the Lease's third quarter, effective December 1, 2000. 7/

Ridgerunners responded to both the show-cause letter and the rent reappraisal. In a December 9, 2000 letter to the BIA, Ridgerunners argued that, notwithstanding its failure to timely appeal the rent reappraisal for the second quarter, it did not owe the increased rent because the BIA consistently had billed Ridgerunners for only $1,200.00. The BIA, which apparently did not respond to Ridgerunners' December 2000 correspondence, neither cancelled the Lease nor attempted, at that time, to collect the $10,500.00 balance.

On January 5, 2001, Ridgerunners appealed the Lease's third-quarter rent reappraisal to the Regional Director. Ridgerunners by this appeal also attempted to appeal—again—the Lease's second-quarter rent reappraisal. On April 12, 2001, the Regional Director dismissed Ridgerunners' appeal of the Lease's third-quarter rent reappraisal as untimely, as it had not been mailed within thirty days of the date on which Ridgerunners received notice of the BIA's third-quarter rent reappraisal, i.e., December 1, 2000. In his September 19, 2001 order, the Regional Director declined to consider Ridgerunners' attempt to appeal the Lease's second-quarter reappraisal, concluding that the second-quarter reappraisal became final when Ridgerunners had failed to file a timely appeal.

---

6/ (Cont'd from page 5.)

appeal claimed that it had paid $3,230.00 for the November 1999 billing (applicable to the 2000 calendar year), Def.'s Br. filed July 27, 2009, Ex. J at 2, the record to date does not evidence any payment by Ridgerunners for the 2000 calendar year beyond the $1,200.00 that it consistently had paid for the previous years, see Def.'s Br. filed June 11, 2009, Ex. B at 1.

7/ In its April 2004 appeal to the Regional Director, Ridgerunners stated that "[i]n November 2002, we were informed the lease payment had been increased by $90 per year, retroactive to the year 2000." Def.'s Br. filed July 27, 2009, Ex. J at 2. The record undercuts this statement. Four years earlier, in a December 9, 2000 letter to the BIA, Ridgerunners affirmed that it "received a notice that the payment for 2001 has increased by $90 to $3,320." Id., Ex. J at 20.

On May 11, 2001, Ridgerunners submitted a timely notice of appeal of the Regional Director's decision to the IBIA.  While Ridgerunners did not dispute that its appeal of the third-quarter rent reappraisal was untimely, it once again challenged the second-quarter rent reappraisal.  In the Answer of Regional Director & Request for Expedited Consideration and Remand filed on August 8, 2001, in response to Ridgerunners' appeal, the Regional Director requested expedited consideration of Ridgerunners' appeal and asked the IBIA to affirm the dismissal of Ridgerunners' appeal of the third-quarter rent reappraisal.  Additionally, the Regional Director stated that

> to the extent [Ridgerunners] has raised any issues with respect to the [second-quarter] rental adjustment, or the enforcement actions taken or threatened by the BIA, [the Regional Director] requests that all those issues be remanded to him for potential settlement discussions among the Indian landowners, [Ridgerunners], and the BIA.

Yakima Ridgerunners, 44 I.B.I.A. at 75 (internal quotation omitted).  Prior to its decision, the IBIA on August 30, 2001, received a letter from Ridgerunners again disputing the second-quarter rent reappraisal.  On September 19, 2001, the IBIA affirmed the Regional Director's dismissal of Ridgerunners' appeal of the third-quarter rent reappraisal, vacated the remainder of the April 12, 2001 decision that involved the second-quarter rent reappraisal, and remanded the issues concerning the earlier rent invoices to the Regional Director for further proceedings.

The IBIA's order prompted both rent payments and settlement negotiations. Ridgerunners timely paid the reappraised $3,320.00 rent for 2002, 2003, and 2004, respectively.  Although at the time of the IBIA's decision Ridgerunners had not yet paid its rent for the 2001 calendar year—due on December 1, 2000, the first date on which the reappraised $3,320.00 was due—it subsequently paid the overdue principal and interest for 2001 ($5,345.29) in full on May 14, 2004.  Meanwhile, the Superintendent, pursuant to instructions from the Regional Director, attempted to facilitate a settlement between the Indian landowners, now plaintiffs in this action, and Ridgerunners regarding the Lease's second-quarter principal and interest remaining in arrears. 8/  The settlement negotiations

---

8/  In its April 2004 appeal to the Regional Director, Ridgerunners disputed whether negotiations ever occurred.  Ridgerunners argued that "[a]t no time since the first signing of this lease in 1970 have there been any negotiations concerning rent increases, nor has there been any negotiation concerning the [BIA's Yakama Nation] Reality [sic] Office's retroactive increases and interest on them."  Def.'s Br. filed July 27, 2009, Ex. J at 2. Ridgerunners quoted a dictionary definition of "negotiation" as "to confer with another to

ultimately reached an impasse, as the records reflect that one of the Indian landowners contacted the BIA on January 30, 2004, requesting the collection of all overdue payments and the cancellation of the Lease.

The BIA's subsequent attempts to collect payment, encourage settlement, and cancel the Lease were unavailing.  On February 5, 2004, according to a chronology of Lease events prepared for this litigation by the BIA entitled "Yakama Agency Lease No. 5-1-7865-9110" (the "lease summary"), Ridgerunners received a letter from the BIA's Yakama Nation Realty Office (the "Realty Office") demanding payment of the Lease's overdue principal and interest and threatening cancellation of the Lease in accordance with the show-cause letter received by Ridgerunners on October 10, 1997. 9/  Def.'s Br. filed July 27, 2009, Exs. I at 3, J at 21.  Ridgerunners promptly responded.  By a telephone call to the Realty Office, Ridgerunners inquired about the status of settlement negotiations, and, in a February 17, 2004 letter to the Realty Office, Ridgerunners protested that 1) Ridgerunners had paid the invoiced amount; 2) the Realty Office was responsible for any accrued rent and interest; and 3) Ridgerunners was "interested in trying to reach a solution which would be equitable to all parties." Id., Ex. I. at 3.  In a subsequent March 26, 2004 letter in response to Ridgerunners, the BIA gave official notice of 1) its cancellation of the Lease, effective immediately in accordance with the BIA's October 1997 and November 2000 show-cause letters; 2) a sixty-day grace period within which Ridgerunners could remove its improvements to the Allotments; and 3) Ridgerunners' right, with the posting of a $52,362.02 appeal bond, to appeal the Lease's cancellation to the Regional Director within thirty days.

Ridgerunners' timely appeal, which was received by the Regional Director on April 21, 2004, disputed as unreasonable—and Ridgerunners thus declined to submit—an appeal bond.  Def.'s Br. filed July 27, 2009, Ex. J at 3 (citing 25 C.F.R. § 2.5 (2003)).  As with its earlier protests, Ridgerunners again characterized the Lease's second-quarter rent reappraisal,

---

8/ (Cont'd from page 7.)

arrive at the settlement of some matter; to arrange or bring about through conference, discussion and compromise."  Id. (internal quotation omitted).   Semantics aside, Ridgerunners then declared that "[t]he negotiation by the Reality [sic] Office [of the BIA's Yakama Nation] has been to tell the landowners that Ridgerunners owed them a large sum of money, and do they want to cancel the lease because of this."  Id.  Thus, regardless of whether Ridgerunners approved of the negotiating posture taken by the BIA, it tacitly acknowledged that negotiations had taken place.

_____9/  During argument defendant clarified that the BIA is responsible for the lease summary.  Tr. at 22.

8

including the principal and interest thereby due, as unjust and unreasonable.  Similarly, Ridgerunners recounted the BIA's continued billing of $1,200.00 after the reappraisal and the BIA's failure to negotiate a settlement that would be agreeable to both Ridgerunners and the Indian landowners, concluding that, "[i]f there is money owed to the landowners due to inaction by the Reality [sic] Office, it is owed by the Reality [sic] Office, as this is their [sic] negligence in not performing lease payment negotiations in a timely manner, and not billing Ridgerunners for the correct amount."  Id., Ex. J at 3.  Ridgerunners at the same time declared its continued interest in a "reasonable solution to this issue," and, although disavowing any liability for accrued interest on overdue rent for the Lease's second quarter, Ridgerunners offered "to pay one half of the remaining rent shown in arrears on the attachment to the 10 day show cause letter if the Reality [sic] Office will pay the other half plus the interest."  Id., Ex. J at 4.  In conclusion, Ridgerunners requested that the Regional Director withhold consideration of its appeal for sixty days to allow the parties to continue settlement negotiations.

In response to Ridgerunners' appeal, Roger A. Jacob, Sr., Manager of the Yakama Nation Trust Real Estate Services, on May 14, 2004, issued a notice—with copies to the Northwest Regional Office and the Superintendent—rescinding the Lease's cancellation and confirming a face-to-face settlement meeting scheduled for June 16, 2004. 10/  The June 16, 2004 settlement meeting proved unsuccessful, and Ridgerunners and the Indian landowners remained at loggerheads.  In his letter dated June 23, 2004, the Superintendent summarized Ridgerunners' and the Indian landowners' respective positions: Ridgerunners insisted "that they [sic] paid what they [sic] were billed, and that since they [sic] were not notified in time, that the Bureau of Indian Affairs should be liable for the increase," while the Indian landowners requested immediate payment in full and the Lease's cancellation.  Def.'s Br. filed June 11, 2009, Ex. E at 2-3.  The Superintendent concluded that

---

        10/  Mr. Jacob's notice also acknowledged receipt of Ridgerunners' payment of the overdue principal and interest for the 2001 calendar year, which originally was due on December 1, 2000.  Def.'s Br. filed June 11, 2009, Ex. D at 1.  Defendant's generalized reference to the payment received on May 14, 2004, might imply that this payment was for accrued principal and interest from the Lease's second quarter, see id. at 8, but plaintiffs clarify that this payment was "a full payment of the adjusted rent for lease year 2001 (plus interest), not a partial payment for any of the outstanding rent for lease years 1996-2000, which is the subject of [plaintiffs'] action," Pls.' Br. filed July 8, 2009, at 2.  The language of Mr. Jacob's letter—"[w]e received your lease payment for the rental due 12/1/00 . . ."—and the BIA's record of Ridgerunners' payments, see Def.'s Br. filed June 11, 2009, Ex. B at 1, validate plaintiffs' clarification of this ambiguity.

1) with its certified letters of November 1996, October 1997, and November 2000, the BIA had properly notified Ridgerunners of the Lease's second-quarter rent reappraisal;

2) notwithstanding the BIA's November 1996, October 1997, and November 2000 letters, the BIA had not timely informed Ridgerunners of the rental increase due on December 1, 1995, and therefore, Ridgerunners was not liable for the unpaid principal or interest for the 1996 calendar year;

3) Ridgerunners' appeal of the second-quarter reappraisal was untimely;

4) Ridgerunners was liable for the unpaid principal and interest for the 1997-2000 calendar years, a total of $17,007.73 (of which $8,887.73 was interest calculated through June 30, 2004); and

5) Ridgerunners had thirty days within which to post an appeal bond and appeal the decision to the Regional Director.

Id., Ex. E at 1-4.

On July 23, 2004, Ridgerunners timely appealed the Superintendent's decision to the Regional Director. Yakima Ridgerunners, 44 I.B.I.A. at 76. On October 8, 2004, the Regional Director modified, but otherwise affirmed, the Superintendent's decision. The Regional Director held that the BIA's continued billing of $1,200.00 after the November 1996 notice did not absolve Ridgerunners of its responsibility to pay the $3,230.00 amount as to which it had been properly notified. The Regional Director then directed the Superintendent to invoice Ridgerunners for the Lease's unpaid principal and interest; the Superintendent, in turn, issued a payment demand on October 27, 2004, in the amount of $22,773.85, representing the accrued principal and interest for the Lease's entire second quarter (including the unpaid principal and interest from the 1996 rental period). Ridgerunners was given fifteen days within which to satisfy the debt.

On November 5, 2004, Ridgerunners timely appealed the Regional Director's October 8, 2004 decision to the IBIA. After Ridgerunners' opening brief professed a willingness to mediate the dispute, the IBIA on January 31, 2005, removed the appeal from its active docket and ordered Ridgerunners and the Indian landowners to participate in an assessment conference to evaluate the likely success of additional alternative dispute resolution ("ADR"). However, on October 24, 2005, the Department of the Interior's Office of Collaborative Action and Dispute Resolution informed the IBIA that ADR would not be successful. On January 11, 2007, after returning the appeal to its active docket, the IBIA

slightly modified, but otherwise affirmed, the Regional Director's decision, holding Ridgerunners liable for all accrued principal and interest from the Lease's second quarter, less the interest levied on the principal due for the 1996 calendar year. 11/ According to the IBIA, Ridgerunners fruitlessly challenged the Lease's second-quarter rent reappraisal and the BIA's subsequent collection efforts:

> The bottom line is this: In return for having a 20-year lease with a fixed annual rent for a minimum of five years, [Ridgerunners] agreed that its rent could be adjusted periodically at increments of not less than five years. . . . Therefore, when [Ridgerunners] received notice that its rent had been adjusted, it could not claim surprise—it knew it was subject to a rent increase and it agreed to have its rent adjusted.

> The decision to adjust [Ridgerunners'] rent became final and effective at the end of the 30-day appeal period when [Ridgerunners] did not file an appeal in this timeframe [sic]. Therefore, for the second quarter of [Ridgerunners'] lease, the annual rental amount due then became $3,230. Thus, there is nothing in the above "process" that merits vacating the Regional Director's decision that [Ridgerunners] is liable for $10,150 in unpaid rent for calendar years 1996-2000.

Id. at 81-82.

The BIA's collection efforts subsequent to the IBIA's January 11, 2007 decision remained unsuccessful. On January 26, 2007, the BIA billed Ridgerunners for the Lease's unpaid principal ($10,150.00) and interest ($12,587.80). Ridgerunners did not pay, and on February 9, 2007, Ridgerunners received a BIA demand providing ten days within which to satisfy the accrued debt ($22,737.80) and to show cause why the Lease should not be

---

11/ The IBIA found the following:

> Although the annual rent for 1996 was due on December 1, 1995, nothing in the record shows that [Ridgerunners] was informed of the rent adjustment prior to November 26, 1996. [Ridgerunners] cannot be expected to remit payment until it has been informed of the amount due. Therefore, we conclude that it is not reasonable to impose interest prior to the time the new adjustment was communicated to [Ridgerunners] and became due and payable.

Yakima Ridgerunners, 44 I.B.I.A. at 82.

cancelled. Ridgerunners again did not pay, and on March 13, 2007, Ridgerunners received the BIA's notice of the Lease's impending cancellation and a thirty-day window within which to appeal the cancellation, with bond, to the Regional Director. Ridgerunners neither paid the accrued debt nor appealed, and the Lease's cancellation became effective on April 12, 2007. 12/ On April 30, 2007, the BIA again invoiced Ridgerunners for the outstanding debt ($22,752.80); again, Ridgerunners did not pay. Later, in separate correspondence to Ridgerunners dated May 18, 2007; October 5, 2007; and January 18, 2008, respectively, the BIA restated Ridgerunners' liability ($22,752.80 as of April 3, 2007, plus interest) and affirmed the Government's commitment to collect payment. 13/

While the BIA sparred with Ridgerunners concerning the Allotments' improvements and the accrued second-quarter rent, the lessors (now plaintiffs) initiated their own collection efforts. On July 9, 2007, plaintiffs' attorney served a letter on the Secretary of the Interior through the Office of the Regional Solicitor, Department of the Interior, demanding compensation in the amount of $50,426.41 for breach of trust and fiduciary duties allegedly arising from defendant's failure to collect the Lease's accrued rent. The Secretary did not respond. However, plaintiffs allege that the Secretary, acting through the Superintendent in March 2008, attempted to convince the Yakama Nation to file a legal action against Ridgerunners in Yakama Tribal Court in order to recover the outstanding rent balance. According to plaintiffs, the Yakama Nation declined to take such action, citing lack of authority and/or personal jurisdiction. 14/ On September 3, 2008, the Yakama Nation served

_____

12/ Plaintiffs' complaint filed March 11, 2009, alleges that "[o]n April 12, 2007, defendant, acting through the Acting Superintendent [of the BIA], finally cancelled the lease." Compl. ¶ 37. Defendant's motion explains that the cancellation—which was noticed in the correspondence received by Ridgerunners on March 13, 2007—became effective on April 12, 2007. Def.'s Br. filed June 11, 2009, at 9 n.4.

_____

13/ The primary purpose of the May 18, 2007 correspondence was to advise Ridgerunners of its obligation to remove its improvements to the Allotments. On June 15, 2007, in response to Ridgerunners' suggestion that the Indian landowners desired to retain the improvements, the BIA granted a sixty-day extension to Ridgerunners for the improvements' removal. See Def.'s Br. filed June 11, 2009, Ex. F at 27, 29. After the Indian landowners agreed that the improvements should be removed, the BIA issued its October 5, 2007 demand for the removal and restated the amount of Ridgerunners' liability for the accrued rent. See id., Ex. F at 30-31.

_____

14/ Defendant has asserted that as of June 11, 2009, plaintiffs had "not brought, nor attempted to bring, any enforcement actions against the lessee." Def.'s Br. filed June 11, 2009, at 10.

a letter on the Secretary through the Regional Director demanding compensation in the amount of $60,395.70 for breach of trust and fiduciary duties allegedly arising from defendant's failure to collect the Lease's accrued rent.  The Secretary did not respond.

Although the Secretary did not respond to plaintiffs' September 3, 2008 demand, the BIA recently had taken action on Ridgerunners' accrued debt.  On August 8, 2008, the BIA referred Ridgerunners' debt to the National Business Center (the "NBC"), the Department of the Interior's internal office responsible for referring debt-collection efforts to the Department of the Treasury ("Treasury").  Stanley Chan, an Accounting Technician for the Billing and Collection Office of the NBC, has submitted a declaration stating that the NBC has prepared Ridgerunners' file for transfer to Treasury, but is unable to make the transfer because the Yakama Nation's employees, acting under an Indian Self-Determination Act contract, 25 U.S.C. § 638 (2006), must provide additional information for the file.  Declaration of Stanley Chan, June 10, 2009, Def.'s Br. filed June 11, 2009, Ex. G.  According to Mr. Chan, on May 26, 2009, he received an e-mail from the Yakama Nation acknowledging the required additional information—and assuring that the Yakama Nation would provide this information in a timely manner—but he had received no follow-up correspondence from the Yakama Nation.  Mr. Chan further states that he will transfer Ridgerunners' file to Treasury as soon as the Yakama Nation completes its required data submission.  The Yakama Nation evidently provided the required information to the NBC after the conclusion of the litigants' briefing, as defendant informed the court at oral argument that Ridgerunners' debt has been transferred to Treasury.   Transcript of Proceedings, Confederated Tribes & Bands of the Yakama Nation v. United States, No. 09-160L, at 4 (Fed. Cl. Sept. 14, 2009) ("Tr.").

Plaintiffs filed their complaint on March 11, 2009.  Plaintiffs claim that the Secretary's acts and omissions have breached the Government's fiduciary and trust duties to enforce the Lease and collect the Lease's accrued second-quarter rent on plaintiffs' behalf pursuant to 25 U.S.C. §§ 380, 415(a), as well as the regulations implementing the Indian Long-Term Leasing Act found at 25 C.F.R. pt. 162.  Plaintiffs allege that the Government breached its fiduciary duty owed to plaintiffs by each of the following failures to act:

> 1) Ridgerunners failed to pay the Lease's accrued rent after receiving the BIA's show-cause letter on October 10, 1997; nevertheless, the BIA failed to cancel the Lease and failed to refer the Lease's outstanding balance to Treasury "for collection as a federal debt within 180 days as required by the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3711(g)(1)(A)." Compl. ¶ 14.

13

2) In 1997, 1998, and 1999, Ridgerunners paid only $1,200.00 for rent, failing to pay the full $3,230.00 due to the BIA for the corresponding upcoming rental periods; nevertheless, the BIA failed to cancel the Lease and failed to refer the Lease's outstanding balance to Treasury for collection "within 180 days as required by statute." Id. ¶¶ 15-17.

3) After its show-cause letter on November 30, 2000, the BIA failed to cancel the Lease or refer the rent's outstanding balance to Treasury for collection. Id. ¶ 18. Plaintiffs cite the revised leasing regulations promulgated in 2001 under 25 C.F.R. pt. 162, according to which the BIA "'will ensure that tenants meet their payment obligations to Indian landowners, through the collection of rent on behalf of the landowners and the prompt initiation of appropriate collection and enforcement actions.'" Id. ¶ 20 (quoting 25 C.F.R. § 162.108(a)).

Importantly, the complaint also suggests that the Secretary allowed the statute of limitations for judicial enforcement to expire, thus barring the BIA's ability to collect the Lease's unpaid balance through a judicial action for money damages. The applicable statute of limitations provides:

[E]very action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later: *Provided*, That in the event of later partial payment or written acknowledgment of debt, the right of action shall be deemed to accrue again at the time of each such payment or acknowledgment: *Provided further*, That an action for money damages brought by the United States for or on behalf of a recognized tribe, band or group of American Indians shall not be barred unless the complaint is filed more than six years and ninety days after the right of action accrued.

28 U.S.C. § 2415(a) (2006).

Plaintiffs chart the following chronology to demonstrate that § 2415(a) bars the Secretary's judicial enforcement of the Lease's accrued debt:

1) On or about March 27, 2003, a period of approximately six years and ninety days lapsed since the $4,060.00 balance for 1996 and 1997 had accrued. Compl. ¶ 25.

14

2) On or about March 1, 2004, a period of approximately six years and ninety days lapsed since the $2,030.00 balance for 1998 had accrued.  Id. ¶ 26.

3) On or about March 1, 2005, a period of approximately six years and ninety days lapsed since the $2,030.00 balance for 1999 had accrued.  Id. ¶ 34.

4) On or about March 1, 2006, a period of approximately six years and ninety days lapsed since the $2,030.00 balance for 2000 had accrued.  Id. ¶ 35.

5) On or about January 11, 2008, a period of one year lapsed since the IBIA's final decision dated January 11, 2007.  Id. ¶ 40.

Defendant's motion challenges the court's subject matter jurisdiction to consider plaintiffs' claim.  Defendant argues that two sets of regulations under the Indian Long-Term Leasing Act apply to plaintiffs' claim and furnishes, in relevant part, excerpts from the pre-2001 and post-2001 enactments of 25 C.F.R. pt. 162.  Defendant argues that plaintiffs' claim is not yet ripe because the Government continues to explore available judicial and non-judicial debt-collection mechanisms.  Def.'s Br. filed June 11, 2009, at 1 ("Plaintiffs' suit is not yet ripe because it is premised upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (quoting Texas v. United States, 523 U.S. 296, 300 (1998))).  Defendant also disputes plaintiff's application of § 2415(a), contending that Ridgerunners' "numerous acknowledgments and partial payments of the debt" re-started the statute of limitations for judicial action. 15/  Id. at 13 n.6; see also Def.'s Br. filed July 27,

_____

    15/ Defendant offers three examples of Ridgerunners' "numerous" acknowledgments and partial payments: 1) Ridgerunners' January 19, 2005 correspondence stating that "Ridgerunners is willing to pay one half of the principal amount from 1997 to 2000"; 2) a lease summary entry dated February 17, 2004, providing that "[Ridgerunners] stated [that it] would pay the rent and interest [for 1999] . . . [Ridgerunners] feels that Yakima Agency Reality (sic) should be responsible for any back rent or interest; and . . . Ridgerunners is still interested in trying to reach a resolution which would be equitable to all parties"; and 3) Ridgerunners' April 21, 2004 correspondence requesting negotiation with the Indian landowners.  Def.'s Br. filed July 27, 2009, at 5-6 (citing Midstates Res. Corp. v. Farmers Aerial Spraying Serv., Inc., 914 F. Supp. 1424, 1426-27 (N.D. Tex. 1996), for proposition that requests to negotiate outstanding debt that do not express concomitant unwillingness to pay such debt are considered "written acknowledgment" sufficient to restart limitations period) (internal quotations omitted).

2009, at 5 (<u>citing</u> 28 U.S.C. § 2415(a) ("That in the event of later partial payment or written acknowledgment of debt, the right of action shall be deemed to accrue again at the time of each such payment or acknowledgment . . . .")).

Having discounted plaintiffs' invocation of the statute of limitations, defendant next maintains that the Debt Collection Act, as amended by the Debt Collection Improvement Act of 1996, 31 U.S.C. §§ 3701-3720E (2006), and regulations promulgated thereunder, 31 C.F.R. pt. 900 (2009), anticipate the Secretary's continued and as-yet uninitiated debt-collection efforts. 16/ Defendant insists that the BIA—the executive agency charged with the initial prosecution of the Lease's debt-collection efforts under 31 U.S.C. § 3711(a)(1)—only recently and unsuccessfully has concluded its attempts to collect Ridgerunners' debt and that the BIA properly and timely has prompted the debt's transfer to Treasury. Treasury can refer the debt to the Department of Justice for litigation or initiate any of the "numerous non-judicial, administrative options available for continuing enforcement" prescribed by the Debt Collection Improvement Act. 17/ Def.'s Br. filed June

---

15/ (Cont'd from page 15.)

Defendant is mistaken in its interpretation of the lease summary entry for February 17, 2004. In full, the relevant section of the summary provides that "<u>[i]f proof of payment cannot be found for the rental due December 1, 2000</u>, [Ridgerunners] stated [that it] would pay the rent and interest." <u>Id.</u>, Ex. I at 3 (emphasis added). Ridgerunners' rental payment due on December 1, 2000, was for the 2001 calendar year, a rental period falling within the Lease's third, not second, quarter. On May 14, 2004, the BIA received Ridgerunners' $5,345.29 payment for the 2001 calendar year, which included the $3,320.00 originally due on December 1, 2000, plus interest. <u>See</u> Def.'s Br. filed June 11, 2009, Ex. B at 1. The quoted language from the lease summary entry dated February 17, 2004, does not constitute Ridgerunners' acknowledgment that it would pay the accrued rent and interest from the relevant period of plaintiffs' claim: the Lease's second quarter.

16/ Defendant correctly notes that 31 C.F.R. pt. 900 does not create private causes of action. Def.'s Br. filed June 11, 2009, at 5 n.2 (<u>citing</u> 31 C.F.R. § 900.8 ("The standards in this chapter do not create any right or benefit, substantive or procedural, enforceable at law or in equity by a party against the United States, its agencies, its officers, or any other person, nor shall the failure of an agency to comply with any of the provisions of parts 900-904 of this chapter be available to any debtor as a defense.")).

17/ According to defendant, Treasury's arsenal of non-judicial and administrative debt-collection tools includes "administrative offset, tax refund offset, Federal salary offset, referral to private collection contractors, referral to agencies operating a debt collection

16

11, 2009, at 13-14.  Thus, defendant urges that ripeness has not been achieved because the Secretary's prospective judicial and administrative debt-collection actions may result in the full recovery of Ridgerunners' accrued debt or, at a minimum, change the operative facts of the case.

Plaintiffs respond that any administrative debt-collection mechanism will be futile and unable to ensure the collection of Ridgerunners' debt; therefore, the alleged expiration of the statute of limitations for the judicial enforcement option has established the Government's breach of trust and fiduciary duties.  Plaintiffs re-assert the BIA's duties under the post-2001 version of 25 C.F.R. pt. 162—to "ensure that tenants meet their payment obligations to Indian landowners, through the collection of rent . . . and the prompt initiation of appropriate collection and enforcement actions," 25 C.F.R. § 162.108(a).  Pls.' Br. filed July 8, 2009, at 3.    Plaintiffs elaborate that, "assuming that the government does not succeed administratively, the only way that defendant can 'ensure' that Ridgerunners will 'meet its payment obligations' is to seek a judicial remedy before the applicable statute of limitations has expired."  Id. at 4.  Noting that the Government's claims against Ridgerunners accrued each time Ridgerunners failed to pay according to its Lease obligations and that the statute of limitations expired for each claim in the chronological order described in the complaint, 18/ plaintiffs emphasize that "[t]he crucial event for plaintiffs' claim was the government's

_____

17/ (Cont'd from page 16.)

center, reporting delinquencies to credit reporting bureaus, and garnishing the wages of delinquent debtors."  Def.'s Br. filed June 11, 2009, at 13-14 (citing 31 U.S.C. §§ 3716, 3720A, 3720B, 3720D, 3720E; 31 C.F.R. pt. 900).

_____    18/  Setting aside how 28 U.S.C. § 2415(a) might apply following the January 11, 2007 IBIA decision, plaintiffs slightly modify the complaint's chronological application of § 2415(a).  The complaint calculated—and applied to each of the Secretary's claims for Ridgerunners' unpaid rent—either a March 27 or a March 1 expiration of the six-year and ninety-day limitations period, as provided by § 2415(a).  Compl. ¶¶ 25-26, 34-35.  Thus, the complaint's application of § 2415(a) for the March 27, 2003 expiration began with the BIA's November 26, 1996, notice to Ridgerunners of the rent's reappraisal; for the subsequent March 1 expirations in 2004-2006, the limitations period began with Ridgerunners' annual payment deadline of December 1.  In contrast, plaintiffs now assert that, because rent notices were sent on or before December 1 of each year, Ridgerunners' lease payments were not due and payable until January 1, thereby accruing plaintiffs' claims approximately one month later and causing the six-year and ninety-day statute of limitations to expire on or about April 1, 2003, for the 1996-1997 lease years; April 1, 2004, for the 1998 lease year; April 1, 2004, for the 1999 lease year; and April 1, 2005, for the 2000 lease year.  Pls.' Br. filed July 8, 2009, at 5.

failure to follow up [sic] on the [January 11,] 2007 IBIA decision with a diligent pursuit of the delinquent rent within one year [by January 11, 2008]." Id. at 8.  According to plaintiffs, the Secretary neglected to refer Ridgerunners' debt to Treasury for collection within 180 days, as required by 31 U.S.C. § 3711(g)(1)(A). Id. at 6.  Consequently, the Government did not initiate judicial enforcement within the stipulated "one year after final decisions have been rendered in applicable administrative proceedings." 28 U.S.C. § 2415(a). Id. at 4-8. Plaintiffs contend that regardless of the Secretary's administrative attempts to collect Ridgerunners' debt, expiration of § 2415(a)'s statute of limitations on January 11, 2008, fixed the Government's liability for breach of trust and fiduciary duties, thereby accruing plaintiffs' claim under the Court of Federal Claims' statute of limitations, 28 U.S.C. § 2501 (2006), and making it ripe for adjudication.  See id. at 9 ("A claim for damages against the United States first accrues 'when all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action' and the plaintiff 'was or should have been aware of their existence.'" (quoting Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988))).

Defendant counters that plaintiffs "inappropriately dismiss and disregard the nonjudicial . . . mechanisms [available to the Government] for debt collection." Def.'s Br. filed July 27, 2009, at 2; see also supra note 17.  According to defendant, plaintiffs' claim is not ripe because the Secretary's administrative options are hardly futile and may result in the collection of Ridgerunners' debt.  Further, because of Ridgerunners' acknowledgments of and requests to negotiate its debt, the statute of limitations has not expired on the Government's potential judicial enforcement.  See supra note 15.  Recognizing that plaintiffs' claim stems from the collection of debt accrued between 1996 and 2000, defendant criticizes plaintiffs' reliance on 25 C.F.R. § 162.108 and other leasing regulations that became effective in 2001.  Similarly, defendant argues that plaintiffs misread the Debt Collection Improvement Act and its enacting regulations.  Pursuant thereto, debt-collection efforts must be transferred to Treasury after a 180-day delinquency, not within 180 days (as asserted by plaintiffs).  Def.'s Br. filed July 27, 2009, at 6 n.3 (citing 31 C.F.R. § 901.1(c)). Finally, defendant concludes by suggesting that if, as plaintiffs assert, their claim accrued

---

18/ (Cont'd from page 17.)

If there is any merit to either application of § 2415(a), the correct application likely is that in the complaint.  The Lease provides that Ridgerunners' rent was due on or before December 1, not January 1, and Ridgerunners' history of rental payments tacitly acknowledges as much, as well.  Compare Def.'s Br. filed June 11, 2009, Ex. A at 1 (providing Lease's terms), with id., Ex. B at 1 (showing that BIA received almost all annual payments before December 1).

18

under 28 U.S.C. § 2501 when plaintiffs knew or should have known of its existence, "[p]laintiffs' claim are [sic] for outstanding rent due from 1996-2000[;] Plaintiffs were well aware of the breach and is [sic] more than six years [as established by § 2501] before Plaintiffs filed this action." Id. at 7.

## DISCUSSION

Defendant challenges this court's subject matter jurisdiction on two grounds. First, defendant insists that plaintiffs' claim is not ripe for review. Second, defendant's reply brief suggests that plaintiffs' claim is barred by 28 U.S.C. § 2501.

## I. Standard of review and jurisdictional challenge relating to ripeness

The ripeness doctrine is based on the "case or controversy" requirement of Article III of the Constitution, Blanchette v. Conn. Gen. Ins. Corps., 419 U.S. 102, 138 (1974), which is a necessary predicate to a federal court's subject matter jurisdiction over a plaintiff's claim, see Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc., 527 F.3d 1278, 1290 (Fed. Cir. 2008).

Jurisdiction must be established before the court may proceed to the merits of a case. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88-89 (1998). Courts are presumed to lack subject matter jurisdiction unless it is affirmatively indicated by the record; therefore, it is a plaintiff's responsibility to allege facts sufficient to establish the court's subject matter jurisdiction. Renne v. Geary, 501 U.S. 312, 316 (1991). Once the court's subject matter jurisdiction is put into question, it is "incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction . . . . [The plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." Reynolds, 846 F.2d at 748; see also McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936) ("If [plaintiff's] allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, [plaintiff] must support them by competent proof.").

When confronted with a motion to dismiss filed pursuant to RCFC 12(b)(1) and reviewing the sufficiency of a complaint for lack of subject matter jurisdiction, the court's task "is necessarily a limited one," whereby "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982). When the movant challenges merely the facial sufficiency of the pleadings, the court will accept as true a plaintiff's undisputed allegations of fact, see id., and indulge all reasonable inferences in favor of the non-movant, Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). Nevertheless, when the RCFC 12(b)(1) motion controverts the plaintiff's jurisdictional allegations and challenges the factual basis

of the court's jurisdiction, the plaintiff must demonstrate facts sufficient to support jurisdiction. Cedars-Sinai Med. Ctr., 11 F.3d at 1583-84. In assessing a plaintiff's proof, the court will not be limited to the allegations of the complaint, but instead "may consider [other] relevant evidence in order to resolve the factual dispute." Reynolds, 846 F.2d at 747; see also Moyer, 190 F.3d at 1318.

As a sovereign, "the United States may be sued only to the extent that it has consented to suit by statute, and the terms of that consent define the jurisdiction of the court to hear those suits." Shore v. United States, 9 F.3d 1524, 1525 (Fed. Cir. 1993) (citing United States v. Testan, 424 U.S. 392, 399 (1976)). Plaintiffs' complaint generally alleges subject matter jurisdiction under 1) the Tucker Act, 28 U.S.C. § 1491(a)(1) (2006); and 2) 28 U.S.C. § 1505 (2006), which prescribes the court's jurisdiction over claims against the United States by or on behalf of American Indians. The Tucker Act "confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States, and . . . waives the Government's sovereign immunity for those actions." 28 U.S.C. § 1491(a)(1); Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc); see also Emery Worldwide Airlines, Inc. v. United States, 49 Fed. Cl. 211, 220 (2001), aff'd, 264 F.3d 1071 (Fed. Cir. 2001). The Tucker Act grants jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." § 1491(a)(1). Additionally, § 1505 further establishes the Court of Federal Claims' jurisdiction, allowing the court to hear any claim against the United States

> in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would not be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group.

28 U.S.C. § 1505.

## II.  Whether plaintiffs' claim is ripe

As a constitutional doctrine, ripeness ensures the existence of a justiciable case or controversy by forcing federal courts to withhold consideration of premature adjudication. See Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967). The critical question is, ultimately, whether a case involves "contingent future events that may not occur as

anticipated, or indeed may not occur at all." <u>Texas v. United States</u>, 523 U.S. 296, 300 (1998) (internal quotation omitted); <u>Cedars-Sinai Med. Ctr.</u>, 11 F.3d at 1583.

A ripeness dispute requires the application of a two-part test by which a court must evaluate 1) the fitness of the issues for judicial decision; and 2) the hardship to the parties of withholding court consideration. <u>Caraco Pharm. Labs.</u>, 527 F.3d at 1294-95 (<u>citing</u> <u>Abbott Labs.</u>, 387 U.S. at 149). As to the former, "an action is fit for judicial review where further factual development would not 'significantly advance [a court's] ability to deal with the legal issues presented.'" <u>Id.</u> at 1295 (<u>quoting</u> <u>Nat'l Park Hospitality Ass'n v. Dep't of Interior</u>, 538 U.S. 803, 812 (2003)). The latter anticipates an assessment of whether "withholding court consideration of an action causes hardship to the plaintiff where the complained-of conduct has an 'immediate and substantial impact' on the plaintiff." <u>Id.</u> (<u>quoting</u> <u>Gardner v. Toilet Goods Ass'n</u>, 387 U.S. 167, 171 (1967)). A sufficient risk of immediate hardship may warrant prompt adjudication. <u>Cedars-Sinai Med. Ctr.</u>, 11 F.3d at 1580-81. Both prongs of the two-part test must be satisfied for a claim to be found ripe. <u>Id.</u> at 1581.

### 1. The fitness of the issues for judicial review

Defendant's central premise—that the suit is not ripe because "many avenues of recourse [exist] by which the government can collect [the debt]," thus altering the operative facts of the case, Def.'s Br. filed June 11, 2009, at 14—implicates the fitness of the issues for judicial resolution. An evaluation of this fitness requires an assessment of the BIA's administrative and remedial activities corresponding to Ridgerunners' debt vis-à-vis the BIA's express legal responsibilities pursuant to the Indian Long-Term Leasing Act, which the litigants agreed at argument would establish the relevant scope of any trust and fiduciary duties. Tr. at 35, 49. Although plaintiffs' claim is not predicated on the Debt Collection Improvement Act, it is discussed to illuminate the relevant framework for the collection of debts arising under Indian leases—indicating what the BIA could have done to collect Ridgerunners' debt and at what periods—and to substantiate the BIA's relative inactivity. Plaintiffs have shown a record of dilatory BIA behavior culminating in the expiration of the statute of limitations on one debt-collection tool contemplated by the Debt Collection Improvement Act: litigation initiated by the Department of Justice. This expiration and the BIA's debt-collection activity leading thereto implicate the BIA's trust and fiduciary duties asserted under the Indian Long-Term Leasing Act, rendering plaintiffs' claim fit for judicial review.

### 1) The Indian Long-Term Leasing Act

The Indian Long-Term Leasing Act and its implementing regulations provide the legal framework for the administration and review of leases of Indian lands by the BIA, the

Regional Director, and the IBIA. As an initial matter, the court agrees with defendant that the pre-2001 enactment of 25 C.F.R. pt. 162 (1999), not the post-2001 regulations cited by plaintiffs, applied to the day-to-day administration of the Lease from 1996-2000, the Lease's second quarter. According to the pre-2001 regulations, owners of Indian lands held in trust or restricted status could lease these lands with the approval of the Secretary of the Interior, 25 C.F.R. § 162.5(a) (1999), 19/ and, "[w]hile the leased premises [were] in trust or restricted status, all of the lessee's obligations under [the] lease . . . [were] to the United States as well as to the owner of the land," id. § 162.5(g)(1) (1999). Upon a satisfactory showing that a lease of Indian lands had been violated, "the lessee [was to] be served with written notice setting forth in detail the nature of the alleged violation and allowing him ten days from the date of receipt of notice in which to show cause why the lease should not be cancelled." Id. § 162.14 (1999). Thereafter, "[i]f within the ten-day period[] it [was] determined that the breach may be corrected and the lessee agree[d] to take the necessary corrective measures, he [was to] be given an opportunity to carry out such measures and . . . a reasonable time within which to take corrective action." Id. On the other hand, "[i]f the lessee fail[ed] within such reasonable time to correct the breach or to furnish satisfactory reasons why the lease should not be cancelled, the lessee [was to] forthwith be notified in writing of the cancellation . . . and demands [were to] be made for payment of all obligations." Id. Lease cancellations were appealable, and notices of cancellation were to "inform the lessee of his right to appeal pursuant to part 2 of this chapter." Id.

Plaintiffs' cited regulations became applicable only after the amendment of 25 C.F.R. pt. 162. See Trust Management Reform: Leasing/Permitting, Grazing, Probate and Funds Held in Trust, 66 Fed. Reg. 7,068-01 (Jan. 22, 2001) (to be codified at 25 C.F.R. pts. 15, 114-15, 162, 166). Effective March 23, 2001, the superseding Indian Long-Term Leasing Act regulations now obligate the BIA to "ensure that tenants meet their payment obligations to Indian landowners, through the collection of rent on behalf of the landowners and the prompt initiation of appropriate collection and enforcement actions." 20/ 25 C.F.R. § 162.108(a). In the event of a lease violation by a tenant, the regulations stipulate that the BIA will send the tenant and its sureties a notice of violation providing ten days within which to cure the violation, dispute the violation, or request additional time within which to cure the violation. Id. § 162.618. If violations are not cured within the requisite time period, the BIA will consult with the Indian lessors to determine the appropriate recourse, which may include

_____

19/ Under these regulations the authority to approve and subsequently to administer Indian leases is delegated from the Secretary of the Interior to the BIA. See supra note 1.

20/ Without conceding the applicability of the post-2001 regulations, at oral argument defendant emphasized the discretionary nature of § 162.108(a)'s prescription for "appropriate collection and enforcement actions." Tr. at 55-56 (citing § 162.108(a)).

delivering a notice of cancellation, providing additional time to remedy the violation, or initiating other remedial action under the lease. Id. § 162.619.  Failure to pay rent according to the terms of a lease is a violation that should trigger the remedial tools of §§ 162.618-19. See id. §§ 162.615(a), (b). 21/

At all times relevant hereto, both before and after the 2001 amendment of the Indian Long-Term Leasing Act regulations, the pertinent procedures contained in 25 C.F.R. pt. 2 regulating appeals of lease cancellations or any other adverse BIA decision were unchanged. According to 25 C.F.R. § 2.7, the BIA must provide written notice of its decisions to all interested parties, which is to include direction for appealing the decision within thirty days to an official therein identified.  Notices of appeal filed by mail are considered filed on the date they are postmarked, placing the burden of proof of timely filing on the appellant.  Id. § 2.9(a).  No extensions of time are permitted beyond the initially provided thirty-day window.  The contents of a notice of appeal must abide by 25 C.F.R. §§ 2.9(c), 2.10 (requiring a statement of reasons), and copies of the notice of appeal must be sent to all known interested parties, the official whose decision is being appealed, and the official deciding the appeal, id. § 2.9(a).  An interested party that fails to file its notice of appeal within thirty days will suffer dismissal of the appeal, id. § 2.17(a), and the BIA's original decision will be made final and effective, id. § 2.6(b).  Indeed, the final disposition of an untimely appeal is clear: "Notices of appeal not filed in the specified time shall not be considered, and the decision involved shall be considered final for the Department [of the Interior] and effective in accordance with § 2.6(b) [finality of decisions]."  Id. § 2.9(a).

## 2) The Debt Collection Improvement Act and federal debt-collection standards

The Debt Collection Improvement Act provides the relevant statutory and regulatory standards for the Government's debt-collection efforts. 22/  As a general matter, the Debt

---

    21/ Defendant at oral argument emphasized the language of § 162.615(b), Tr. at 44-45, which provides that "[i]f a tenant fails to provide adequate proof of payment or cure the violation within the requisite time period . . . , and the amount due is not in dispute, [the BIA] may immediately take action to recover the amount of unpaid rent and any associated interest charges or late payment penalties," § 162.615(b) (emphasis added).

    22/ Under the Debt Collection Improvement Act, "the term 'claim' or 'debt' means any amount of funds or property that has been determined by an appropriate official of the Federal Government to be owed to the United States by a person, organization, or entity other than another Federal agency." 31 U.S.C. § 3701(b)(1).  The term "claim" further includes "any amount the United States is authorized by statute to collect for the benefit of any person," "any fines or penalties assessed by an agency," and "other amounts of money or property owed to the Government."  §§ 3701(b)(1)(D), (F), (G).

Collection Improvement Act requires that debt-collection efforts be initiated by the head of the agency from whose activities the debt arose—in this case, the BIA. 23/ See 31 U.S.C. § 3711(a)(1) ("The head of an executive, judicial, or legislative agency . . . shall try to collect a claim of the United States Government for money or property arising out of the activities of, or referred to, the agency[.]").  When collecting a debt accrued by a lessee of Indian land, the BIA may employ a variety of non-judicial debt-collection tools, including administrative offsets, referrals to debt-collection services, reductions of tax refunds, and garnishment of a debtor's disposable pay. 24/  See generally §§ 3716, 3718, 3720A, 3720D.  Further, to supplement these administrative measures, the BIA 1) shall charge interest and penalties to delinquent debts; 2) may bar delinquent debtors from receiving federal financial assistance; and 3) may disseminate information regarding the identity of debtors and their debts for the purpose of collecting delinquent amounts.  See generally §§ 3717, 3720B, 3720E.  The BIA also must report a summary of its accrued claims to Treasury on at least an annual basis, see § 3719(a), and at the same time provide "other information [Treasury] considers necessary to decide whether the head of the agency is acting aggressively to collect the claims of the agency[,]" § 3719(a)(3).

The Debt Collection Improvement Act further contemplates that if BIA debt-collection efforts remain unsuccessful for a period of 180 days, Treasury will assume the debt-collection responsibilities.  According to § 3711,

> [i]f a nontax debt or claim owed to the United States has been delinquent for a period of 180 days – (A) the head of the executive, judicial, or legislative agency that administers the program that gave rise to the debt or claim shall transfer the debt or claim to the Secretary of the Treasury; and (B)

---

23/ Defendant appears to predicate its analysis of the BIA's debt-collection efforts under the Debt Collection Improvement Act on the Secretary of the Interior's delegation of authority for approving and administering Indian leases to the BIA.  See supra note 1.

24/ Notwithstanding whether it is practically possible to collect a debt or claim in its entirety utilizing these non-judicial tools, the statutory language suggests that they would allow collection in full.  See 31 U.S.C. § 3716(a) ("[T]he head of an . . . agency may collect the claim by administrative offset."); § 3718(a) ("[T]he head of the agency may enter into a contract with a person for collection service to recover indebtedness owed . . . ."); § 3720A(c) ("Upon receiving notice from any Federal agency . . . the Secretary of the Treasury . . . . [s]hall reduce such [debtor's tax] refunds by an amount equal to the amount of such debt . . . ."); § 3720D(a) ("[T]he head of an . . . agency . . . may in accordance with this section garnish the disposable pay of the individual to collect the amount owed . . . .").

upon such transfer the Secretary of the Treasury shall take appropriate action
to collect or terminate collection actions on the debt or claim.

§ 3711(g)(1); <u>see also</u> § 3716(c)(6) (requiring that agencies notify Treasury of past-due, legally enforceable debts over 180-days delinquent for administrative offsets).  Upon the receipt of a debt or claim from the BIA or any other agency, Treasury then may prompt debt-collection efforts by a referral to 1) a public debt-collection center; 2) a private debt-collection contractor; or 3) the Department of Justice for litigation, as well as by other action in accordance with the Debt Collection Improvement Act and other applicable statutes. §§ 3711(g)(4)-(5).  The Debt Collection Improvement Act provides some exceptions to the otherwise mandatory transfer of accrued debts; for example, § 3711 exempts any claim or debt that is in litigation or foreclosure from mandatory transfer.  § 3711(g)(2)(A)(i).

Regulations implemented by Treasury subsequent to enactment of the Debt Collection Improvement Act clarify the scope of the Government's debt-collection responsibilities.  The first, 31 C.F.R. § 285.12 (2009), explicates the necessary transfer of delinquent debts and claims to the Treasury's Financial Management Service (the "FMS") and defines such a transfer as "cross-servicing." 25/ 31 C.F.R. § 285.12(b).  Affirmatively restating an agency's duty to cross-service debt that has been delinquent for 180 days to the FMS, 26/ the regulation provides that "[a] debt is considered 180 days delinquent for purposes of this section if it is 180 days past due and is legally enforceable." <u>Id.</u> § 285.12(c)(3)(i).  A debt is considered past-due if not paid "by the date specified in the agency's initial written demand for payment or applicable agreement or instrument . . . unless other satisfactory payment arrangements have been made." <u>Id.</u>  A debt is legally enforceable "if there has been a final agency determination that the debt, in the amount stated, is due and there are no legal bars to collection action." <u>Id.</u>  A debt is not legally enforceable—even if it is more than 180 days past-due—when it "is the subject of a pending administrative review process required by statute or regulation and collection action during the review process is prohibited." <u>Id.</u> Thereafter, however, "[w]hen a final agency determination is made after an administrative appeal or review process, the creditor agency must transfer such debt to [the] FMS, if more

---

25/ The litigants do not cite § 285.12, although it is cross-referenced as authority within 31 C.F.R. § 901.1(e), which is cited in relevant part by both parties.  <u>See generally</u> Def.'s Br. filed July 27, 2009; Pls.' Br. filed July 8, 2009; Def.'s Br. filed June 11, 2009.

26/ Aside from the mandatory transfer required by 31 C.F.R. § 285.12(c), § 285.12(h) provides creditor agencies with the option to "refer any debt that is less than 180 days delinquent to FMS or, with the consent of FMS, to a Treasury-designated debt collection center for debt collection services."  31 C.F.R. § 285.12(h); <u>see also</u> 31 U.S.C. § 3711(g).

than 180 days delinquent, within 30 days after the date of the final decision." 27/ Id. § 285.12(c)(3)(ii).   In addition, § 285.12 restates the exceptions to mandatory cross-servicing, such as those applicable to debts in litigation or foreclosure, id. § 285.12(d)(2)(i), and provides that a debt is in litigation if it has been referred to the United States Attorney General for litigation by the creditor agency, id. § 285.12(d)(2)(i)(A), or if it is otherwise "the subject of proceedings pending in a court of competent jurisdiction . . . whether initiated by the creditor agency, the debtor, or any other party[,]" id. § 285.12(d)(2)(i)(B).   See also 31 U.S.C. § 3711(g)(2).

The second set of applicable Treasury regulations, cited by both parties at 31 C.F.R. pt. 900 (2009), became effective on December 22, 2000.   See Federal Claims Collection Standards, 65 Fed. Reg. 70,390, 70,391 (Nov. 22, 2000) (to be codified at 31 C.F.R. pts. 900-04).   As quoted by defendant, 28/ 31 C.F.R. § 901.1(e) echoes the previously discussed statutes and regulations and states that "[a]gencies shall transfer to [Treasury] any debt that has been delinquent for a period of 180 days or more," provided such debt is not in litigation, foreclosure, or subject to another exemption.   29/   Id. § 901.1(e).   Section 901.1(a),

---

27/   Upon the conclusion of an administrative appeal or review process, rather than demanding the immediate transfer of a debt that is already delinquent for more than 180 days, 31 C.F.R. § 285.12(c)(3)(ii) provides a thirty-day period to allow a debtor the opportunity to pay its debts or enter into a repayment plan prior to mandatory cross-servicing.   Transfer of Debts to Treasury for Collection, 64 Fed. Reg. 22,906, 22,907 (Apr. 28, 1999) (to be codified at 31 C.F.R. pt. 285).   Nevertheless, the regulations contemplate that "[d]ebts should be transferred to [the] FMS immediately following a decision on an appeal when the agency determines that it is unlikely that the debtor will pay or enter into a repayment plan within the 30 day period."   Id.

28/   Defendant quotes 31 C.F.R. § 901.1(e), but mistakenly cites § 901.1(c).   Def.'s Br. filed July 27, 2009, at 6 n.3.

29/   The enacting regulations make clear that "[t]he 180-day delinquency period begins to run on the date a debt becomes delinquent, that is, when the debt is not paid on the date due," Federal Claims Collection Standards, 65 Fed. Reg. at 70,391, or in accordance with the definition of delinquency found in 31 C.F.R. § 900.2(b): "[a] debt is 'delinquent' if it has not been paid by the date specified in the agency's initial written demand for payment or applicable agreement or instrument (including a post-delinquency payment agreement), unless other satisfactory payment arrangements have been made." § 900.2(b). As does 31 C.F.R. § 285.12(h), see supra note 26, 31 C.F.R. § 901.1 encourages agencies to transfer debts that are less than 180-days delinquent to Treasury or Treasury-designated "debt collection centers" to facilitate more efficient and cost-effective debt collection. § 901.1(d).

meanwhile, recalls the language of 31 U.S.C. § 3719(a)(3)—which prescribes regular reports reflecting whether "the head of the agency is <u>acting aggressively</u> to collect the claims of the agency," § 3719(a)(3) (emphasis added)—and requires that "agencies shall aggressively collect all debts arising out of activities of . . . that agency.  Collection activities shall be undertaken promptly with follow-up action taken as necessary," § 901.1(a).  Similarly, § 901.2(a) provides express instruction for agencies' written payment demands to debtors, stipulating that "[i]n determining the timing of the demand letter(s), agencies should give due regard to the need to refer debts promptly to the Department of Justice for litigation . . . ." 30/ § 901.2(a).  Indeed, § 901.2(a) further provides that, "[w]hen necessary to protect the Government's interest (for example, to prevent the running of the statute of limitations), written demand may be preceded by other appropriate actions under parts 900-904 of this chapter, including immediate referral for litigation."  <u>Id.</u>  Notwithstanding the foregoing, however, the standards of 31 C.F.R. pts. 900-04 do not create any private rights enforceable at law or in equity against the United States.  <u>Id.</u> § 900.8 ("The standards in this chapter do not create any right or benefit . . . .").

### 3) The applicability of the statute of limitations in the context of plaintiffs' claim for breach of trust and fiduciary duties

The statute of limitations applicable to the Government's debt-collection by litigation—referenced obliquely above in 31 C.F.R. § 901.2(a) and applied by plaintiffs and defendant respectively to yield conflicting results—is 28 U.S.C. § 2415(a).  The statute bars any action for money damages commenced by the United States "unless the complaint is filed within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later."  28 U.S.C. § 2415(a).  When an action for money damages is filed on behalf of a recognized tribe, band, or group of American Indians, however, the complaint shall not be barred unless it is filed "more than six years and ninety days after the right of action accrued."  <u>Id.</u>  Nevertheless, "in the event of later partial payment or written acknowledgment of debt, the right of action shall be deemed to accrue again at the time of each such payment or acknowledgment."  <u>Id.</u>

As is dictated by federal statutes of limitations, a claim initially accrues 1) "when all events necessary to state a claim have occurred" and 2) "when claimants know or should know of their potential claims."  <u>Chevron U.S.A., Inc. v. United States</u>, 923 F.2d 830, 834

_____

    30/ Section 904.1(a) states that "[a]gencies shall promptly refer to the Department of Justice for litigation debts on which aggressive collection activity has been taken in accordance with part 901 of this chapter . . . ."  31 C.F.R. § 904.1(a).

(Fed. Cir. 1991). Plaintiffs emphasize that, when determining the accrual of a claim involving the failure to pay an amount due and payable on a lease, a claim has been said to accrue immediately upon the breach of the duty to pay the amount due and payable. See Phillips Petroleum Co. v. Lujan, 4 F.3d 858, 861 (10th Cir. 1993). 31/

For purposes of the statute of limitations, a plaintiff's claim against the Government accrues "when all the events have occurred to fix the liability of the Government and entitle the claimant to institute action." John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1355-56 (Fed. Cir. 2006) (internal quotation omitted), aff'd, 552 U.S. 130 (2008). For a claim against the Government as a fiduciary, such an accrual occurs "only when there is a preexisting duty to act, and the beneficiary then 'knew or should have known of the breach.'" Brown v. United States, 195 F.3d 1334, 1337 (Fed. Cir. 1999) (quoting Jones v. United States, 801 F.2d 1334, 1335 (Fed. Cir. 1986)).

The court concludes that plaintiffs have alleged a breach of trust and fiduciary duties premised on the Indian Long-Term Leasing Act that is fit for judicial review. Plaintiffs have shown that the Debt Collection Improvement Act and the statute of limitations are relevant frameworks for assessing the BIA's lease administration and debt-collection activities. The BIA's dilatory behavior—culminating in the expiration of the Government's statute of limitations—implicates its responsibility to administer the Lease as plaintiffs' trustee regardless of whether additional nonjudicial debt-collection tools remain at Treasury's disposal. Based on the record before the court, one prescribed measure of debt collection is now unavailable, and plaintiffs are not obligated to indulge the Government's exploration of all possible debt-collection mechanisms prior to maintaining a claim for breach of trust and fiduciary duties.

For example, plaintiffs have shown that the BIA's administrative activities during the Lease's second quarter may have conflicted with the agency's trust and fiduciary responsibilities ab initio. On November 26, 1996, after receiving the BIA's belated notice of the reappraised rent for the second quarter of the Lease, Ridgerunners had thirty days within which to appeal the reappraisal under the Indian Long-Term Leasing Act. Ridgerunners failed to appeal, thereby making the reappraised annual rent of $3,230.00 final and effective on December 27, 1996. Nevertheless, the BIA continued to bill and to collect only $1,200.00 annually for at least three more years until at least November 1999 when the BIA arguably (and finally) corrected its invoicing and billed Ridgerunners for $3,230.00 for

---

31/ Although not binding, "the decisions of other regional circuits are persuasive authority and instructive." Bank of Guam v. United States, No. 2008-5078, 2009 WL 2448503, at *6 n.4 (Fed. Cir. Aug. 12, 2009).

the 2000 calendar year, the final year of the Lease's second quarter.  See supra note 6.  Even though Ridgerunners had paid only $1,200.00 for each of the 1996 and 1997 lease years, the BIA made no effort to collect the overdue $4,060.00 balance—either through the delivery of a ten-day show-cause letter in accordance with 25 C.F.R. § 162.14 (1999), or otherwise—for approximately ten months, until the BIA sent a show-cause letter to Ridgerunners in October 1997.  After receiving the show-cause letter on October 10, 1997, Ridgerunners neither responded in writing nor appealed pursuant to 25 C.F.R. pt. 2; yet, the BIA took no subsequent remedial action—whether to collect Ridgerunners' debt or cancel the Lease pursuant to 25 C.F.R. § 162.14 (1999)—for over three years, at which point Ridgerunners received a second show-cause letter from the BIA on November 30, 2000.

Defendant's briefing stresses the sequence of events following the BIA's November 2000 show-cause letter by which 1) Ridgerunners continually protested the Lease's second-quarter rent reappraisal; and 2) after various decisions, appeals, and remands by and between the BIA, the Regional Director, and the IBIA, the IBIA ultimately affirmed both Ridgerunners' liability for all principal accrued from 1996-2000 and all interest levied from 1997-2000.   Still, notwithstanding the back-and-forth debate regarding Ridgerunners' ultimate liability for the accrued principal and interest that followed the show-cause letter, both Ridgerunners' liability for the reappraised rent and the BIA's responsibility to collect Ridgerunners' debt already were established by the Indian Long-Term Leasing Act. Although it may have been unfair or unreasonable for Ridgerunners to receive on November 26, 1996, a reappraised and retroactive rent of $3,230.00, the $3,230.00 rent became final on December 27, 1996, when Ridgerunners failed to appeal the BIA's reappraisal.  Despite its subsequent invoices for $1,200.00, the BIA thereafter was obligated to collect $3,230.00 annually, as well as the $4,060.00 carry-over balance created by the retroactive portion of the reappraisal.  In apparent contravention of its duties as trustee, however, the BIA did not take action.  With two exceptions, show-cause letters were not issued at every instance of a Lease violation.  When Ridgerunners failed to comply with the BIA's November 1996 and October 1997 correspondence by appeal or otherwise, the BIA did not attempt to cancel the Lease or initiate any of its available debt-collection tools.

To the extent that the Debt Collection Improvement Act establishes relevant benchmarks for measuring the BIA's debt-collection activity, plaintiffs have also shown that the BIA, for whatever reason, neglected all of its debt-collection tools as Ridgerunners' debt continued to accumulate.  On December 27, 1996, Ridgerunners' $4,060.00 balance for the 1996 and 1997 calendar years became due and payable to the BIA.  An additional $2,030.00, reflecting Ridgerunners' unpaid balance after its annual payments of only $1,200.00 became due and payable to the BIA on December 1, 1997; December 1, 1998; and December 1, 1999, respectively.   Nevertheless, although the BIA sent three show-cause letters to Ridgerunners—one each in October 1997, November 1997, and November 2000,

29

respectively—during the Lease's second quarter, it did not initiate any of its available non-judicial debt-collection tools. See generally 31 U.S.C. §§ 3716, 3718, 3720A, 3720D. The BIA levied interest charges on Ridgerunners' accrued debt, but no record has been submitted of any attempt by the BIA to penalize Ridgerunners further for its delinquency, or, as the statute requires, to disseminate information regarding Ridgerunners and its outstanding debt. See generally 31 U.S.C. §§ 3717, 3720E. The record developed to date reveals no evidence that the Secretary reported information to the Treasury to substantiate that "the head of the agency [was] acting aggressively to collect the claims of the agency." 31 U.S.C. § 3719(a)(3).

Just as it declined to initiate any administrative debt-collection efforts, the BIA also neglected to cross-service Ridgerunners' debt to Treasury. As acknowledged by defendant, see Def.'s Br. filed July 27, 2009, at 6 n.3, the BIA should have referred Ridgerunners' accrued debt to Treasury when the debt reached 180-days past-due, see § 3711(g)(1). In fact, as applied to Ridgerunners' annual rental payments, in the absence of successful debt-collection efforts by the BIA, the Debt Collection Improvement Act required cross-servicing to occur 1) 180 days after December 27, 1996, for the $4,060.00 balance which became due for the 2006 and 2007 rental periods; 2) 180 days after December 1, 1997, for the $2,030.00 which had thereupon become due; 3) 180 days after December 1, 1998, for the $2,030.00 which had thereupon become due; and 4) 180 days after December 1, 1999, for the $2,030.00 which had thereupon become due. Thereafter, Treasury would have sponsored debt-collection efforts through non-judicial means or would have referred the matter to the Department of Justice for litigation. See §§ 3711(g)(4)-(5).

Defendant incorrectly asserts that, because Ridgerunners disputed its accrued debt, the debt was unfit for transfer by the Secretary of the Interior to Treasury until after the IBIA's final decision on January 11, 2007, which ostensibly fixed the amount of Ridgerunners' liability. See Def.'s Br. filed June 11, 2009, at 13 (citing § 3711(g)(2)(A)(i)) (stating that "the statute anticipates that an agency should not transfer a disputed debt to Treasury"). Defendant reads the language of the Debt Collection Improvement Act too broadly. The Act does not exclude automatically a "disputed" debt from cross-servicing; rather, it provides that "any debt or claim that is in litigation or foreclosure" is excluded from cross-servicing. § 3711(g)(2)(A)(i). At the expiration of the 180-day period following the date on which each of Ridgerunners' debts was due, not one of Ridgerunners' debts—neither the initial $4,060.00 balance, nor the subsequently and annually tallied $2,030.00 balances—was in litigation or foreclosure, and each debt should have been cross-serviced

accordingly. 32/  If § 3711(g)(2)(A)(i) operated at all to forestall the cross-servicing of Ridgerunners' debt, it would not have applied until approximately January 5, 2001, when Ridgerunners first appealed (whether legitimately or not) the second-quarter reappraisal. 33/

Notably, December 2000 through January 2001 seems to have been a turning point for the BIA.  December 22, 2000, the effective date of the second set of Debt Collection Improvement Act regulations cited herein, 31 C.F.R. pts. 900-04, coincides with the

-------

32/  The first regulation to amend the Debt Collection Improvement Act discussed herein, 31 C.F.R. § 285.12, enacted and amended in 1998 and 1999, respectively, clarified that Ridgerunners' debts should have been considered to be 180-days delinquent and accordingly cross-serviced to Treasury as set forth above—180 days after December 27, 1996, and 180 days after December 1 of 1997, 1998, and 1999. See id. § 285.12(c)(3)(i) ("A debt is considered 180 days delinquent . . . if it is 180 days past due and is legally enforceable."). Ridgerunners' debts were past-due on those dates because they had not been paid on the date specified by the BIA according to either the November 26, 1996 notice of reappraisal (payment required by December 26, 1996) or the Lease itself (payment required by December 1, annually).  See id. § 285.12(c)(3)(i).  Ridgerunners' debts were legally enforceable on those dates after the reappraised rent was made final when Ridgerunners failed to appeal the reappraisal by December 26, 1996, and no other form of administrative review was required by statute or regulation.  See id. § 285.12(c)(3)(i).  Moreover, in order to be excluded from the cross-servicing requirements on account of litigation or foreclosure, the regulations confirm that Ridgerunners' debts would have had to have been referred to the Attorney General for collection or have been the subject of pending litigation in a court of competent jurisdiction.  Id. § 285.12(d)(2)(i).  The amended regulations should have reminded the BIA of the immediate need to cross-service Ridgerunners' debt when the amendments became effective.  They evidently did not.  Ridgerunners' debt arguably fell within the cross-servicing exclusions for the first time on January 5, 2001, when Ridgerunners first appealed the second-quarter reappraisal; prior to that, however, the Department of the Interior made no attempt to cross-service the debt.

-------

33/  Defendant's reference to 25 C.F.R. § 162.615(b) at oral argument is similarly unconvincing, supra note 21, as this regulation became effective in March 2001, long after the BIA's first opportunity to cross-service Ridgerunners' debts first arose. While § 162.615(b) subsequently may have operated to insulate the BIA from any obligation to cross-service Ridgerunners' debt during the protracted appellate process from March 2001 until the IBIA's ostensibly final decision in January 2007, it excuses neither an unwillingness to cross-service the debt from 1996 until 2001, nor the ultimate expiration of the Government's statute of limitations as discussed infra.

31

BIA's—and relatedly, Ridgerunners'—most straightforward attempts to comply with the Indian Long-Term Leasing Act and the Debt Collection Improvement Act. Consequently, in an attempt to bolster its argument that plaintiffs' claim is not ripe and to elide the BIA's dilatory behavior until that point, defendant details and emphasizes the protracted appellate history involving Ridgerunners' debt subsequent to the BIA's show-cause letter of November 30, 2000, beginning with Ridgerunners' January 2001 appeal to the Regional Director and culminating in the IBIA's ostensibly final decision on January 11, 2007. Nonetheless, contrary to its intentions, defendant cannot redeem the BIA's earlier inadequate lease administration and debt-collection efforts or detract from the fitness of plaintiffs' claim. Not only have plaintiffs made a showing that the BIA's earlier actions may have violated its trust and fiduciary duties, plaintiffs have also shown that, when measured against the governing statutes and regulations, the BIA's subsequent activities may have failed to satisfy its trust and fiduciary duties.

Under one scenario the BIA's November 30, 2000 demand letter initiated a sequence of events approximating the lease administration and debt collection contemplated by the Indian Long-Term Leasing Act and the Debt Collection Improvement Act. After recognizing (again) that Ridgerunners' accrued debt violated the Lease, the BIA sent its November 30, 2000 demand letter to Ridgerunners in accordance with 25 C.F.R. § 162.14 (1999). On December 9, 2000, Ridgerunners timely responded to the BIA's demand letter in accordance with § 162.14 (1999). On January 5, 2001, in conjunction with a timely appeal of the BIA's reappraisal of Ridgerunners' rent for the Lease's third quarter pursuant to 25 C.F.R. § 2.9(a), Ridgerunners also appealed the BIA's reappraisal of Ridgerunners' rent for the Lease's second quarter. Thereafter, as has been set forth, Ridgerunners and the BIA embarked on a six-year odyssey of timely appeals, remands, and negotiations regarding Ridgerunners' accrued second-quarter debt, which seems to have led, appropriately, to the IBIA's January 11, 2007 decision fixing the amount of principal and interest owed by Ridgerunners for the Lease's second quarter. 34/

Under the more plausible and, for the purposes of the instant motion, determinative scenario, the BIA's lease administration and debt collection during this time period continued

_____

34/    Throughout this period, the BIA may not have been obligated to refer Ridgerunners' debt to Treasury—an obligation which had been reiterated in 31 C.F.R. § 901.1(e)—because, in accordance with 31 C.F.R. § 285.12(c)(3)(i), the debt was the subject of a pending administrative review process and may not have been legally enforceable despite being 180 days past-due. Alternatively, after January 2001 and until January 2007, the debt may have been in dispute according to 25 C.F.R. § 162.615(b) and ineligible for remedial action by the BIA. See supra note 33.

to suggest a breach of its trust and fiduciary duties for at least two reasons.  First, Ridgerunners did not timely appeal the Lease's second-quarter rent by December 26, 1996; therefore, in accordance with 25 C.F.R. § 2.9(a), Ridgerunners' obligation to pay $3,230.00 annually was already final and effective.  Similarly, Ridgerunners' obligation to pay the accrued principal and interest for 1996 and 1997 became final and effective when Ridgerunners failed to respond to or appeal the BIA's October 1997 demand letter.  The Department of the Interior should not have engaged in its appellate consideration of the Lease's second-quarter reappraisal when Ridgerunners, in accordance with 25 C.F.R. § 2.9(a), was appealing the third-quarter reappraisal.  Even under the most generous interpretation of the permissible scope of the Government's appellate review of the Lease's second quarter, Ridgerunners could have appealed only its accrued rent from 1998, 1999, and 2000, for which no demand letter or BIA decision had been delivered. 35/  Any other appellate consideration should have been disallowed. 36/

Second, even as the BIA dallied with its debt-collection efforts, the statute of limitations was running for a judicial debt-collection action.  While it may have coincided with the BIA's improved lease administration and debt-collection efforts, the implementation of 31 C.F.R. pts. 901-04 should have reminded the BIA not only of the need to act aggressively and promptly when collecting Ridgerunners' debt, see § 901.1(a), but also of the running of the statute of limitations against the Department of Justice's litigation option, see id. § 901.2(a).  As stated in § 904.1(a):

––––––––––––––––––––

35/ Surprisingly, none of the appellate consideration of Ridgerunners' debt—not even the ostensibly final decision by the IBIA on January 11, 2007—distinguished Ridgerunners' second-quarter debt that accrued from 1996 until 1997 (for which Ridgerunners received notice but failed to appeal) from that which accrued for the subsequent three years, from 1998 until 2000 (for which no BIA action was taken until a November 2000 demand letter).

36/ Even if Ridgerunners' appeals were proper and to the limited extent that they may have been, after the IBIA decision on January 11, 2007, the BIA waited almost nineteen months, until August 8, 2008, to begin cross-servicing Ridgerunners' debt. Unmentioned by both parties is the extent to which this delay contravened the prescribed cross-referencing schedule established by the Debt Collection Improvement Act.  After the IBIA's ostensibly final decision, Ridgerunners' debt was incontestably 180 days past-due; legally enforceable; and, as a consequence, subject to mandatory cross-servicing within thirty days.  See 31 C.F.R. §§ 285.12(c)(3)(i)-(ii).  Further, Ridgerunners' extensive record of delay and denial might have put the BIA on notice that a thirty-day delay would be ineffectual and that Ridgerunners' debt should have been cross-serviced immediately after the January 11, 2007 decision.  See supra note 27.

Debts should be referred as early as possible, consistent with aggressive agency collection activity and the observance of the standards contained in parts 900-904 of this chapter, and, in any event, <u>well within the period for initiating timely lawsuits against debtors</u>. Agencies shall make every effort to refer delinquent debts to the Department of Justice within one year of the date such debts last became delinquent.

<u>Id.</u> § 904.1(a) (emphasis added). <u>37/</u>

A government claim against Ridgerunners accrued on each date that Ridgerunners missed a prescribed deadline for paying its second-quarter rent—December 27, 1996, for calendar years 1996 and 1997; December 1, 1997, for 1998; December 1, 1998, for 1999; and December 1, 1999, for 2000—for which the $3,230.00 rental amount unassailably was final and effective on account of Ridgerunners' failure to appeal the rent's reappraisal as of December 27, 1996. <u>See</u> <u>Chevron U.S.A.</u>, 923 F.2d at 834; <u>Phillips Petroleum Co.</u>, 4 F.3d at 861. Although defendant argues that the appellate process of Ridgerunners' debt from 2001 until 2007 deferred the appropriate cross-servicing date, appellate review within the Department of Interior of Ridgerunners' second-quarter debt—at least that which accrued in 1996 and 1997, as discussed above—was likely inappropriate, as Ridgerunners' liability became fixed prospectively when it failed to appeal the rent's reappraisal. Thus, the statute of limitations would have continued to run and—when discounting entirely the propriety of the second quarter's appellate review and assuming no other intervening event tolled the statute—ultimately expired on or about March 1, 2006, six years and ninety days after the accrual of the last claim arising from the Lease's second quarter. <u>See</u> 28 U.S.C. § 2415(a).

Still, defendant argues that intervening events did re-set the Government's statute of limitations. According to defendant, Ridgerunners acknowledged and offered to negotiate its outstanding debt on several occasions, the latest of which appears to have been on January 19, 2005. <u>See</u> Def.'s Br. filed July 27, 2009, Ex. H; <u>supra</u> note 15. Defendant cites <u>Midstates Res. Corp. v. Farmers Aerial Spraying Serv., Inc.</u>, 914 F. Supp. 1424, 1426-27 (N.D. Tex. 1996), for the proposition that requests to negotiate a debt that do not express an unwillingness to pay the debt are considered "acknowledgments" sufficient to restart the limitations period. Similarly, binding precedent holds that an acknowledgment of a debt is

---

37/ Section 904.1(a) further counsels that the referral of a debt to Treasury for future litigation by the Department of Justice must abide by the other prescribed standards for cross-servicing, § 904.1(a), and § 901.1 restates what already has been shown—that debts should not be cross-serviced if not legally enforceable or if in litigation or foreclosure, <u>id.</u> §§ 901.1(d), (e)(1). <u>See also</u> 31 C.F.R. § 285.12.

sufficient to restart a limitations period if, based upon the acknowledgment's accompanying circumstances, the court can infer an intention or promise to pay the debt. See Int'l Potato Corp. v. United States, 142 Ct. Cl. 604, 608 (1958); Elliott v. United States, 134 Ct. Cl. 197, 198 (1956). Such circumstances could resurrect an otherwise barred claim by providing an entirely new point of accrual and statute of limitations period. See, e.g., Elliot, 134 Ct. Cl. at 198. Therefore, Ridgerunners' alleged acknowledgments would trigger an entirely new limitations period of six years and ninety days. See § 2415(a) ("[I]n the event of . . . written acknowledgment of debt, the right of action shall be deemed to accrue again at the time of each such payment or acknowledgment[.]").

Ridgerunners' communications did not initiate a new statute of limitations period. On one hand, Ridgerunners' January 19, 2005 letter concluded with an admission that "Ridgerunners is willing to pay one half of the principal amount from 1997 to 2000." Def.'s Br. filed July 27, 2009, Ex. H at 3. Such a concession suggests a willingness to pay, at least in part, that surpasses the alleged acknowledgments found insufficient to restart statutes of limitations in Int'l Potato Corp., 142 Ct. Cl. at 608 (finding that alleged acknowledgment was merely a "polite statement"), and Elliott, 134 Ct. Cl. at 199 (finding that alleged acknowledgment merely furnished requested information and expressed moral support). Nonetheless, Ridgerunners hedges its ultimate responsibility for the accrued second-quarter debt in its January 19, 2005 letter, impugning the BIA's invoicing and debt-collection and stating that "I do not know what Federal laws apply to this matter, but my attorney tells me that . . . this is not a legally owed debt. I feel that . . . the [Government] is more culpable than Ridgerunners." Def.'s Br. filed July 27, 2009, Ex. H at 3. Such language hardly rises to the level of a sufficiently unequivocal acknowledgment of indebtedness that would suffice to restart the statute of limitations.

Similarly, the purported acknowledgments and requests to negotiate found in Ridgerunners' notice of appeal from April 19, 2004, Def.'s Br. filed July 27, 2009, Ex. J at 2-4, are unconvincing. Ridgerunners concluded its notice of appeal by suggesting that it "is willing to pay one half the remaining rent shown in arrears . . . if the [Government] will pay the other half plus the interest . . . . If the [Regional Director] feels that a resolution can be reached through negotiation with the landowners, we are in favor of this approach . . . ." Id., Ex. J at 4. Ridgerunners still disputed its indebtedness entirely, stating that "[i]f there is money owed to the landowners . . . it is owed by the [Government], as this is [its] negligence in not performing lease payment negotiations in a timely manner, and not billing Ridgerunners for the correct amount." Id., Ex. J at 3. Ridgerunners argued that it "does not feel they [sic] owe any interest with the exception of lease year 2001." Id., Ex. J at 4. And, although Ridgerunners may have suggested a willingness to negotiate the Lease's accrued debt, Ridgerunners suggested that future negotiations would remain unsuccessful if the

Government continued its tactic from earlier negotiations: insisting that Ridgerunners owed a debt to the Indian landowners. 38/ Id., Ex. J at 2-4.

When considered in conjunction with Ridgerunners' well-documented dilatory actions, such language does not restart the statute of limitations. Defendant's cited case law itself states that "'[i]t is very generally held that an acknowledgment that a sum of money is actually due, if made without any accompanying denial of willingness, justifies the inference of a promise to pay.'" Midstates Res. Corp., 914 F. Supp. at 1426-27 (quoting United States v. Blusal Meats, 817 F.2d 1007 (2d Cir. 1987) (emphasis added)). Moreover, according to the United States Court of Claims:

> "[A]n acknowledgment cannot be regarded as an admission of indebtedness, where the accompanying circumstances are such as to repel that inference, or to leave it in doubt whether the party intended to prolong the time of legal limitation." This is representative of the general rule that "The force of an acknowledgment [sufficient to toll the statute of limitations] depends in most states upon the inference to be drawn from it of an intention to pay. *If there is anything in the surrounding circumstances, even though not in the words of the acknowledgment*, tending to negative such an inference or to leave it in doubt, the indebtedness will not be revived."

Int'l Potato Corp., 142 Ct. Cl. at 608 (alteration in original) (emphasis in original) (citation omitted). Despite Ridgerunners' professed desire to seek a mutually equitable solution, negotiate, and partially pay the Lease's accrued balance, Ridgerunners' accompanying equivocal statements and behavior evidence Ridgerunners' continuous denial of its indebtedness, thereby "negativing" Ridgerunners' intention to pay.

Defendant insists that the Government can still pursue and collect Ridgerunners' debt through either judicial or administrative means. Regardless, plaintiffs' alleged claim for breach of trust and fiduciary duties already has accrued. Plaintiffs have shown that the BIA may have breached its trust and fiduciary duties by assessing its dilatory administration of the Lease and collection of Ridgerunners' debt against the standards of the Indian Long-

---

38/ The BIA's decision of June 23, 2004, further contextualizes Ridgerunners' "negotiating": Ridgerunners insisted "that they [sic] paid what they [sic] were billed, and that since they [sic] were not notified in time, that the Bureau of Indian Affairs should be liable for the increase." Def.'s Br. filed June 11, 2009, Ex. E at 3.

Term Leasing Act, the Debt Collection Improvement Act, 39/ and the statute of limitations. Ultimately, such a showing sufficiently establishes, for purposes of ruling on defendant's motion to dismiss, "a preexisting duty to act, and [that plaintiffs] then 'knew or should have known of the breach.'" See Brown, 195 F.3d at 1337 (quoting Jones, 801 F.2d at 1335). Although defendant insists that the Government's future debt-collection efforts will alter "the operative facts of this case," Def.'s Br. filed June 11, 2009, at 1, hypothetical actions have no bearing on the accrual and fitness of plaintiffs' claim as alleged. Rather, they are relevant to the determination of the amount of damages that plaintiffs may recover. While the amount of money that the Government and plaintiffs might recover from Ridgerunners remains premised upon "contingent future events," Texas, 523 U.S. at 300 (internal quotation omitted), plaintiffs' claim as framed in their complaint is not. Plaintiffs' claim is fit for judicial review.

Defendant carefully has explained that the Government's debt-collection actions and choices are wholly discretionary in nature, and—in conjunction with its aforementioned insistence on the Government's debt-collection options—has directed the court's attention to Heckler v. Chaney, 470 U.S. 821, 831-32 (1985), and 25 C.F.R. § 162.615(b). See Tr. at 10; see also Def.'s Br. filed July 27, 2009, at 6. The court remains convinced that plaintiffs' claim has accrued and is fit for judicial review. Defendant draws the proposition that "whether the United States will ever bring a judicial action for enforcement of a debt is committed to agency discretion by law" from Heckler. 470 U.S. at 831-32. Heckler, however, is distinguishable—the action originally was brought to compel an agency action and to determine the scope of judicial review over agency decisions under the Administrative Procedure Act, 5 U.S.C. § 501 (2006), see Heckler, 470 U.S. at 823. To the extent that the decision might apply at all, it speaks to whether a viable or successful claim has been brought, not a ripe one. Similarly, although 25 C.F.R. § 162.615(b) seems to commit the nature of any remedial action by the BIA to the BIA's discretion, 40/ the discretionary nature of any BIA debt-collection action also speaks to the merits of plaintiffs' claim, not its ripeness. Plaintiffs seek not to compel any BIA action, but instead to hold the BIA accountable for its record of decision-making—or, more precisely, the lack thereof—dating

---

39/  31 C.F.R. § 900.8 disallows private causes of action enforceable against the United States for failure to comply with 31 C.F.R. pts. 900-04; however, plaintiffs' showing is that the BIA's neglect of the Debt Collection Improvement Act and its implementing regulations is not limited to 31 C.F.R. pts. 900-04.

40/  "[W]e may immediately take action to recover the amount of the unpaid rent . . . . [W]e may also cancel the lease . . . , or invoke any other remedies available under the lease or applicable law, including collection on any available bond or referral of the debt to [Treasury] for collection." § 162.615(b) (emphasis added).

back to the Lease's second quarter, culminating in the expiration of the Government's statute of limitations and measured against the trust and fiduciary duties obligated by the Indian Long Term Leasing Act. 41/

As distinguished by plaintiffs, <u>Bannum, Inc. v. United States</u>, 56 Fed. Cl. 453, 462 (2003), which defendant cites for its discussion of ripeness, clarifies the manner in which plaintiffs' claim is fit for review. In <u>Bannum</u> the court held that a claim for bid preparation costs was filed prematurely because the plaintiff had filed its claim before the conclusion of the procurement process that plaintiff was contesting. <u>Id.</u> The court noted that "a review of pre-award cases where bid preparation costs were sought shows that a necessary, if unstated, precondition to the award of these costs is that plaintiff be a disappointed offeror." <u>Id.</u> The plaintiff, however, was not a disappointed offeror because the procurement process remained open. The court could "foresee at least three possible resolutions to this procurement process: 1) plaintiff could be awarded the contract, 2) another vendor could be awarded the contract, or 3) the [government agency] would decide to cancel the solicitation." <u>Id.</u> One of these outcomes would moot entirely plaintiff's claim, because, "if plaintiff were awarded the contract, the court [could not] see how plaintiff could be entitled to bid preparation costs that [were] already built into the contract price that plaintiff proposed." <u>Id.</u> In the case at bar, the underlying facts of plaintiffs' claim are fixed: the BIA's acts and omissions allegedly have breached trust and fiduciary duties owed to plaintiffs. No necessary preconditions remain. Whether the Government subsequently is able to collect Ridgerunners' debt through

_____

41/  The running of the statute of limitations may also be inconsistent with 25 C.F.R. § 162.108(a), a 2001 amendment to the Indian Long-Term Leasing Act, which would apply to the subsequent expiration of the Government's limitations period. Section 162.108(a) provides that the BIA "will ensure that tenants meet their payment obligations to Indian landowners, through the collection of rent on behalf of the landowners and the prompt initiation of appropriate collection and enforcement actions." <u>Id.</u> § 162.108(a). As plaintiffs have shown, the expiration of the Government's statute of limitations undoubtedly affects the "prompt initiation of appropriate collection and enforcement actions," and arguably militates against the BIA's ability to "ensure that tenants meet their payment obligations." <u>See</u> <u>id.</u>; Pls.' Br. filed July 8, 2009, at 3-8. Contrary to defendant's protestations, now that the Government's judicial enforcement of Ridgerunners' debt is barred, it is unclear whether administrative debt-collection tools alone will be sufficient to ensure Ridgerunners' payment of its accrued debt. Although some of these tools may contemplate an ability to collect a debt in full, <u>see</u> <u>supra</u> note 24 (<u>citing</u> 31 U.S.C. §§ 3716(a), 3718(a), 3720A(c), 3720D(a)), others appear merely to be supplementary tools for assisting other, more vigorous debt-collection efforts, <u>see</u> 31 U.S.C. §§ 3717, 3720B, 3720E.

any of its available debt-collection tools does not alter the claim or render it unfit for judicial review.

  2.  The hardship to the parties of withholding consideration and
  plaintiffs' statute of limitations

  The second prong of ripeness consideration requires an assessment of "the hardship to the parties of withholding court consideration." Caraco Pharm. Labs, 527 F.3d at 1294-95 (internal quotation omitted). The court must assess whether "withholding court consideration of an action causes hardship to the plaintiff where the complained-of conduct has an 'immediate and substantial impact' on the plaintiff." Id. at 1295 (citation omitted). Failure to satisfy the "hardship prong" undercuts "the central concern [of the ripeness] doctrine [of] whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." Cedars-Sinai Med. Ctr., 11 F.3d at 1583 (internal quotation omitted) (alteration in original) (affirming dismissal of claim as not ripe because of failure to satisfy hardship prong even though claim was otherwise fit for judicial review). Thus, even though plaintiffs' claim is fit for judicial review, plaintiffs also must show that they would suffer a hardship if the court withheld consideration of their claim for breach of trust and fiduciary duties. Ridgerunners' unpaid rent and accruing interest do suggest a financial hardship, but the United States Supreme Court previously has observed that "a possible financial loss is not by itself a sufficient interest to sustain a judicial challenge to governmental action." Abbott Labs., 387 U.S. at 153; see also Cedars-Sinai Med. Ctr., 11 F.3d at 1585.

  The court finds that plaintiffs have shown that they would suffer a sufficient non-financial hardship were the court to withhold judicial review: the expiration of the applicable statute of limitations. Plaintiffs contend that the Government, in response to similar claims by other American Indian tribe plaintiffs, frequently defends that the claims are untimely under the relevant statute of limitations, 28 U.S.C. § 2501. Pls.' Br. filed July 8, 2009, at 9-11 (describing expiration of § 2501 on claim for breach of trust in Brown, 195 F.3d at 1337). Indeed, defendant prognosticates that, "[e]ven though the government has not argued whether the statute of limitations bars Plaintiffs' action, . . . . [u]nder Plaintiffs' reading of 28 U.S.C. § 2501, Plaintiffs [sic] claim has already run." Def.'s Br. filed July 27, 2009, at 6-7. According to defendant, "Plaintiffs state that Indian beneficiaries are tasked with bringing claims when [they] 'knew or should have known of the breach.' Plaintiffs' claim are [sic] for outstanding rent due from 1996-2000, Plaintiffs were well aware of the breach and is [sic] more than six years before Plaintiffs filed this action." Id. at 7 (citing Pls.' Br. filed July 8, 2009, at 10 (citing Brown, 195 F.3d at 1337)).

Whether a claim falls within the six-year window of § 2501 implicates the court's subject matter jurisdiction over the claim, and § 2501 is applied rigidly and cannot be waived. John R. Sand & Gravel Co. v. United States, 128 S. Ct. 750, 753-54 (2008); see also Young v. United States, 529 F.3d 1380, 1384 (Fed. Cir. 2008). The timeliness of a claim under § 2501 may require *sua sponte* consideration even when it is not challenged. John R. Sand & Gravel, 128 S. Ct. at 752. Thus, although defendant intimates that plaintiffs' claim may be barred under plaintiffs' particular reading of § 2501, a more thorough evaluation of the timeliness of plaintiffs' claim must be undertaken to establish subject matter jurisdiction.

The court concludes that plaintiffs' claim for breach of trust and fiduciary duties is not barred by § 2501. Defendant's suggestion of untimeliness implies that defendant has either misread or misunderstood plaintiffs' claim. Plaintiffs claim that "[t]he acts and omissions of the defendant constitute breach of defendant's fiduciary and trust duty to the plaintiffs to enforce and collect rent for lease of their allotments as set forth in the [Indian Long-Term Leasing Act and the Debt Collection Improvement Act]." Compl. ¶ 45. Plaintiffs do not base their claim on the BIA's failure to collect Ridgerunners' outstanding rent from 1996-2000, but on the BIA's breaches of the legal authority—namely, the Indian Long-Term Leasing Act—relevant to the administration of the Lease, considered in the context of the relative benchmarks set by the Debt Collection Improvement Act and the Government's statute of limitations. Regarding the latter, plaintiffs allege that the culmination of the BIA's acts and omissions constituting breaches of trust and fiduciary duties occurred with the expiration of the Government's statute of limitations for bringing a judicial debt-collection action, 28 U.S.C. § 2415(a). See Pls.' Br. filed July 8, 2009, at 2-8; Compl. ¶¶ 25-26, 34-35, 40.

The Government's causes of action chronologically accrued from 1996 until 2000, and the Government's limitations period for bringing a judicial action thereupon began. Contrary to defendant's assertions, no intervening acknowledgments of debt or partial payments restarted defendant's statute of limitations. As prescribed by § 2415(a), the Government's statute of limitations expired on or about March 1, 2006, six years and ninety days after December 1, 2000, the last date on which Ridgerunners missed a prescribed deadline for a second-quarter rental payment. Moreover, to the extent that it appropriately considered any of Ridgerunners' debt, defendant's appellate record ended definitively with the IBIA's decision on January 11, 2007. At that time, even though the Government might have brought a judicial enforcement action within one year of the decision, see 28 U.S.C. § 2415(a), the Government failed to file a complaint within the limitations period. The BIA's move to cross-service the debt to Treasury for possible litigation began on August 8, 2008, almost seven months after the expiration of the most generous application of the limitations period. Plaintiffs' six-year statute of limitations under § 2501 for bringing this claim, then, began running on or about either March 1, 2006, or January 11, 2008.

40

In the final analysis, the statute of limitations applicable to plaintiffs' claim has not yet expired, although it is running.  Defendant itself declares that "[a]ll plaintiffs face the dilemma of filing a case before the limitations period has run but after all the facts have been determined upon which to base the government's liability."  Def.'s Br. filed July 27, 2009, at 7.   Defendant throws a Faustian bargain at plaintiffs: to trust the Government's administrative debt-collection mechanisms while facing a future hurdle preordained by defendant's comment that "[i]t is possible that at some point the government would argue Plaintiffs have failed to bring a case within the time limits of 28 U.S.C. § 2501, but it is not proper for the United States to speculate in this briefing when that time would be."  Id.  This uncertainty and the time-barred action to which it may lead are sufficient to satisfy the hardship prong of a ripeness inquiry.  Because 1) plaintiffs' claim is fit for judicial review and 2) plaintiffs would suffer hardship if the court were to withhold its review, plaintiffs' claim is ripe.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1.  Defendant's motion to dismiss for lack of subject matter jurisdiction is denied.

2.   The parties shall file a Joint Status Report by October 23, 2009, proposing a schedule and a deadline for discovery.

s/  Christine O.C. Miller

_____
Christine Odell Cook Miller
Judge